Jose Santos **GUZMAN**, Appellant,

v.

Eduardo **GUAJARDO** and Lydia Castro, **Individually and as Representatives of the Estate of Eduardo Castro, Deceased, Appellees.**

No. 13–87–273–CV.

Court of Appeals of Texas, Corpus Christi.

Nov. 23, 1988.

Rehearing Denied Dec. 22, 1988.

Robin W. Welch, McAllen, for appellant.

Ramon Garcia, Felipe Garcia, Jr., Edinburg, for appellees.

Before DORSEY, UTTER and SEERDEN, JJ.

## OPINION

DORSEY, Justice.

Eduardo Guajardo and Lydia Castro, appellees, brought a wrongful death action [1] against appellant, Jose Guzman, and his employer, Ed Payne Motor Company, Inc., and Payne Farms. Appellees alleged that appellant, while acting in the course and

---

**1.** *See* Tex.Civ.Prac. & Rem.Code § 71.002 (Vernon 1986).

scope of his employment with Payne, was negligent in the operation of a motor vehicle and proximately caused the death of their seven-year-old son, Wally.

At the conclusion of the plaintiffs'/appellees' case-in-chief, the court issued a take-nothing directed verdict in favor of Ed Payne Motor Company and Payne Farms. Following the completion of the evidence, the jury found that appellant caused Wally Castro's death by negligently 1) driving at an excessive speed, 2) failing to keep a proper lookout, and 3) failing to take proper evasive action. The jury awarded appellees various damages totaling $1,570,-000.00. Appellant challenges the sufficiency of the evidence by fourteen points of error. We affirm.

By his first through fourth points, appellant contends there is no evidence or, in the alternative, insufficient evidence to support the jury's negligence and proximate cause findings. In considering a "no evidence", "insufficient evidence" or "against the great weight and preponderance of the evidence" point of error, we will follow the well-established test set forth in *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex. 1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456 (Tex.1985); *Glover v. Texas General Indemnity Co.*, 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar*, 395 S.W.2d 821 (Tex. 1965); *Allied Finance Co. v. Garza*, 626 S.W.2d 120 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.); and Calvert, *No Evidence and Insufficient Evidence Points of Error*, 38 Texas L.Rev. 361 (1960). In *Pool*, the Texas Supreme Court held that an appellate court must "clearly state why the jury's finding is so factually insufficient or is so against the great weight and preponderance of the evidence as to be manifestly unjust; why it shocks the conscience." *Pool*, 715 S.W.2d at 635.

At trial, appellant testified that on September 3, 1985, he was traveling north on Texas Avenue, a two-lane road with paved shoulders located in Weslaco, Texas. The speed limit was 45 miles per hour. While driving "30 to 35 miles" per hour, appellant pulled over from the traffic lane on to the shoulder in order to let another vehicle pass. At that point, he noticed three small children, two of whom were on bicycles, standing between the lanes of traffic. While he initially stated that the children were "about a block away" when he first sighted them, he later admitted that he "could not figure distance." The two boys on bicycles started to cross the road in an easterly direction, but then went back toward the median. The third boy, Wally Castro, proceeded to run towards the eastern shoulder of the road. Appellant stated that Wally was "very close" to his truck when he began running. He testified he applied his brakes and skidded, but could not avoid striking the child.

Weslaco Police Officer Medaro Pena was the first to arrive at the scene of the accident. According to his measurements, the right skid mark was 36 feet long and the left skid mark was 26 feet long. Both were slanted in a northeasterly direction. Pena stated that appellant told him that the impact had occurred at a point very close to the northern end of the right skid mark, and that Wally's body had been found behind the truck approximately 13 feet from the edge of the shoulder. Pena's investigation also revealed that appellant's truck traveled another 62 feet forward after striking the child. Pena expressed the opinion that appellant was not traveling in excess of the 45 mile per hour speed limit at the time of the accident.

Sylvia Anciso was a passenger in the car traveling directly behind appellant's truck at about "35 to 40" miles per hour. She testified that the truck appeared to be going "about the same" speed. Upon seeing the three children, she and her mother-in-law, who was also a passenger in the car, told the driver, Miguel Anciso, to slow down. Just before the accident, appellant's truck slowed down and went "toward the shoulder" as another car passed it. Mrs. Anciso estimated that the boy was two car lengths from the truck when he darted across the road. After appellant hit his brakes, Anciso saw the truck skid and turn slightly sideways as it struck the child. In her opinion, appellant "did everything he could" to avoid the accident.

The videotaped deposition of Miguel Anciso was also played for the jury. Mr. Anciso essentially corroborated his wife's testimony, although he estimated that Wally was only 15 to 20 feet in front of Appellant's truck when he began to cross Texas Avenue. He also added that he witnessed Wally's body pass underneath the truck after impact.

The only other eyewitness was sixteen-year-old David Garcia, who testified that Wally was "about a car length" from the truck when he ran in front of it. Garcia was 30 yards from the accident when he saw it occur.

The testimony of accident reconstructionist Tony Cordoba formed the crux of appellees' case. Cordoba stated that based on the skid mark measurements, the location of the point of impact (as told to him by Officer Pena), and the distance which the truck traveled after impact, he calculated that appellant was driving 41.55 miles per hour before he applied his brakes. Taking into account appellant's speed, reaction time, lag time, and the length of the skid, Cordoba also estimated that appellant was 87.82 feet away from Wally when he first realized he would have to try to avoid a collision. Cordoba concluded that appellant had sufficient time in which he could have effectively taken evasive action by swerving his vehicle sharply to the right so as to avoid striking Wally.

Appellant rebutted Cordoba's testimony by calling to the stand McAllen Police Officer Reynaldo Lopez. In Lopez's opinion, Cordoba's estimation of 87.82 feet was too high because it assumed that appellant's truck was equipped with radial tires when it actually had bias ply tires; bias ply tires, according to Lopez, have a lower "coefficient of friction" which would call for a final distance under 87 feet. Lopez also pointed out that the angle of the skid marks indicates that appellant did, in fact, steer his truck to the right before braking. Lopez calculated appellant's speed at "31 to 32 miles per hour."

Negligence requires the presence of three elements: 1) a duty on the part of one person to another; 2) a breach of that duty; and 3) harm to the person to whom the duty is owed as a proximate result of the breach. *Rosas v. Buddies Food Store*, 518 S.W.2d 534, 536 (Tex.1975).

■ The jury's three-part negligence finding is based first on the conclusion that appellant was "driving his vehicle at a greater rate of speed than a person using ordinary care would have driven" under the circumstances, i.e., while children were standing in the middle of a busy, two-lane highway. The evidence of speed was elicited from appellant ("30 to 35 miles per hour"), Reynaldo Lopez ("31 to 32 miles per hour"), Sylvia Anciso ("35 to 40 miles per hour"), and Tony Cordoba (41.55 miles per hour). Regardless of which witness the jury believed, we are unable to conclude that the findings of excessive speed and proximate cause are manifestly unjust in view of the dangerous circumstances in which appellant found himself immediately prior to the accident.

■ The jury also found appellant did not "keep such a lookout as a person using ordinary care would have kept" and failed to "swerve or turn his vehicle to the right before the occurrence in question."

Appellant testified initially that he was "about a block away" from the children when he first saw them in the center of the road. Counsel then read portions of appellant's deposition which revealed that he had previously stated that the children were "half a block" or "about 50 feet" away when he sighted them. Appellant later admitted he had trouble figuring distances. The jury could have concluded from this inconsistent testimony that appellant was not keeping a proper lookout.

On the issue of evasive action, the length of the skid marks and the location of the impact point indicate appellant had at least 36 feet in which to maneuver his truck out of Wally's path. Experts on both sides testified that the angle of the skid marks shows that appellant steered his vehicle *slightly* to the right before applying his brakes. However, given that there were no guard rails on the shoulder of the road, the jury was justified in finding that appel-

lant's failure to *sharply* swerve his truck to the right was negligence and was a proximate cause of Wally's death. We overrule points one, two, three and four.

Appellant argues by his fifth point of error that the jury's failure to find that Wally Castro was negligent, in response to Special Issue No. 5, was so against the great weight and preponderance of the evidence as to be manifestly unjust.

A negative answer to a special issue amounts to nothing more than a failure or refusal by the jury to find from a preponderance of the evidence the facts which the proponent sought to prove. *Ergon Inc., v. Dean*, 649 S.W.2d 772, 779 (Tex.App.—Austin 1983, no writ). This Court has the authority to review a jury's "failure to find" in the same manner in which it may review a jury's findings. *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex.1988).

■ Where the negligence of a child above the age of five is at issue, the child's negligence is to be judged by a standard of conduct applicable to a child of the same age and experience and not by an adult standard. *Yarborough v. Berner*, 467 S.W.2d 188, 190 (Tex.1971); *MacConnell v. Hill*, 569 S.W.2d 524, 526 (Tex.Civ.App.—Corpus Christi 1978, no writ).

■ Appellant points to the testimony of Wally Castro's grandmother, Ofelia, and mother, Lydia, in support of his contention that the failure to find the child negligent is against the preponderance of the evidence. Ofelia Castro stated that on the day of the accident, she told her grandson to stay off of Texas Avenue and to come straight home via an alley. Lydia Castro testified that she had previously taught Wally the dangers of crossing streets and the importance of "keeping an eye out for cars."

However, Sylvia Anciso testified on direct examination that Wally's two companions appeared to be "about eight or nine" years of age. She further stated that these two older boys, who were "straddling" bicycles, made a "motion like they were going to cross" Texas Avenue. The two boys started to cross and then "jerked back," but Wally, who had been hanging onto the back of one of the bicycles, "just kept going." Mrs. Anciso's testimony was uncontroverted in this regard.

It thus appears that the jury's "failure to find" negligence could have been based on the fact that Wally, a seven-year-old, was following the lead of his older companions and yet was unable to react as quickly as they did when appellant's truck began to approach. We are unwilling to conclude that the jury's response to Special Issue No. 5 is against the great weight and preponderance of the evidence. Point five is overruled.

■ Points ten through thirteen challenge the sufficiency of the evidence supporting the jury's award to Lydia Castro of $100,000.00 for past loss of society, $300,000.00 for future loss of society, $200,000.00 for past mental anguish, and $200,000.00 for future mental anguish.

■ Damages for non-pecuniary harm such as loss of society and mental anguish are allowable under the Wrongful Death Statute, Tex.Civ.Prac. & Rem.Code Ann. § 71.001–71.011 (Vernon 1986). *Sanchez v. Schindler*, 651 S.W.2d 249, 251 (Tex.1983). Loss of society refers to a loss of positive benefits flowing from the love, comfort and companionship which a plaintiff would, in reasonable probability, have experienced if the lost family member had lived. Mental anguish represents the emotional pain, torment, and suffering that surviving family members experience as a result of a wrongful death. *Moore v. Lillebo*, 722 S.W.2d 683, 687–88 (Tex.1986).

In *Moore*, the Supreme Court of Texas held that the factors which may be considered in awarding damages for mental anguish and loss of society include: 1) the relationship between the parent and child, 2) the living arrangements of the parties, 3) any absence of the deceased from the beneficiary for extended periods, 4) the harmony of family relations, and 5) common interests and activities. *Moore*, 722 S.W.2d at 688.

According to Lydia Castro's testimony, she and her husband, Wally's father, Eduardo, separated in 1979. Wally was her first child, the only child of her marriage to Eduardo. She and Wally then moved in with her mother, Ofelia. In 1981, Lydia and Wally moved to Dallas, where they resided together for two years. Following a short stay in Edna, Texas, the two returned to Weslaco. Although Wally had been living with his grandmother for several months as of the date of the accident, Lydia had planned for Wally to move back in with her when school started. (Wally was killed on the first day of the school year).

During direct examination, Lydia identified pictures of her son she had taken at several of his birthday parties, and a photograph taken at school, which Wally had asked her to keep in her wallet. She related how a little boy had told her of Wally's accident and how she had rushed to the hospital, where she heard her son screaming in pain. She was pregnant at the time, expecting to give birth any day.

Appellees also offered the deposition testimony of Dr. Ramiro Ramirez, a clinical psychologist who evaluated both Lydia and her husband before trial. Ramirez stated that Lydia exhibited signs of paranoia, hysteria, and severe anger as a result of her son's death. Lydia also told him that her son was her "whole life," and that she was outraged because he no longer existed. Dr. Ramirez found that Lydia was functioning well prior to her son's death, and that her present degree of unhappiness, loneliness, and anger did not exist prior to the child's death.

Dr. Everett G. Dillworth, an economist and business consultant, evaluated the deceased's earning capacity and the value of his household services, and provided guidelines to the jury to put a monetary value on the loss of Wally's society to the parents. He found that Wally would have earned $565,000 after discounting, and that the value of his household services to his mother would have been $86,000 if he assisted her ten hours a week. Dr. Dillworth attempted to evaluate the loss of society by recognizing the positive benefits that are received and used as benchmarks salaries received by the "helping professions," i.e., the clergy, social workers, counselors. He found, without attempting to consider the quality of the society or companionship, that one hour per day over the life expectancy of the mother would discount to a value of $193,000; for the father, Eduardo, $157,000.

Dr. Dillworth stated he was attempting to provide some "benchmarks" or guidelines to aid the jury in evaluating the loss of society, but both the quantity and quality of the society that Wally would have provided was up to the jury to determine. His calculations were aggressively assailed on cross-examination.

We are called upon to determine whether the awards to the mother, Lydia Castro, for loss of society and mental anguish are so against the great weight and preponderance of the evidence as to be manifestly unjust. The valuation of an emotional injury that accrues to the time of trial, using the brief history of the companionship and wrestling with values of intangibles that are not bought and sold, is properly a task for twelve members of the community to manage by a collective decision. How much more difficult to foresee the future quality, quantity, and value of such injuries.

The duty of the intermediate appellate court, thankfully, is not to determine *ab initio* the quality, quantity, and unit value of the components of the intangibles, but rather to determine if the value found by the jury is so against the evidence, or unsupported by the evidence, so as to be manifestly unjust. After carefully reviewing the evidence, we cannot say the awards to Lydia Castro of $400,000 for past and future loss of society and $400,000 for past and future mental anguish are manifestly unjust under the evidence. Points of error ten, eleven, twelve, and thirteen are overruled. *See Moore*, 722 S.W.2d at 688.

Points six through nine assert there was no evidence or, in the alternative, insufficient evidence to support the jury's award of $60,000.00 for future loss of soci-

ety and $100,000.00 for future mental anguish to Wally's father, Eduardo Guajardo. The jury found no damage to Eduardo for loss of society in the past.

While Eduardo did not appear at trial, Ramirez's deposition testimony revealed that he had had a "very good relationship" with Wally, although he had been prevented from getting very close to his son due to the "intensified negative feelings" between Eduardo and Lydia. Ramirez further stated that although they had not lived together since 1979, Eduardo saw Wally approximately once a month while Wally was in Weslaco; moreover, their relationship was "as close as it could be, considering the circumstances." Eduardo has a hearing disability and communicated with Dr. Ramirez through an interpreter. We find this evidence sufficient to support the complained-of findings and overrule points six, seven, eight, and nine.

■ Appellant contends by point of error fourteen that the evidence does not support the jury's award of $600,000.00 for the conscious pain and mental anguish suffered by Wally Castro immediately before his death.

The record reflects that after appellant's truck struck Wally, Wally's body tumbled underneath the vehicle. Appellant testified that Wally was "awake" after the accident and was moaning. Wally's two companions pulled him out from under the truck and laid him on the tailgate, where he remained until an ambulance arrived. Lydia Castro testified that after rushing to the hospital, she heard her son screaming in pain in the emergency room.

The evidence does not reflect exactly how long Wally suffered conscious physical pain before his death. However, Officer Pena testified that he was called to the scene of the accident at 6:08 p.m. He saw Wally lying on the tailgate of appellant's truck at 6:11. Wally's mother heard about the accident at 6:15 and immediately left for the hospital, where she witnessed doctors attempting to give her son blood. She stated that she did not remember how long she was at the hospital.

In *Gulf States Utilities Co. v. Reed*, 659 S.W.2d 849 (Tex.App.—Houston [14th Dist.] 1983, writ ref'd n.r.e.), the Court upheld the jury's $10,000.00 award for five seconds of conscious pain endured by a minor who was electrocuted by a high voltage wire.

*Southern Pacific Transportation Co. v. Luna*, 730 S.W.2d 36 (Tex.App.—Corpus Christi 1987, no writ) (on remand) involved a minor who had been injured in a collision between his father's car and a train. Medical records revealed that the child had no response to painful stimuli and did not improve neurologically after the accident. However, the child's father testified that his son responded to him by opening his eyes occasionally during the last weeks of his life. This Court found that although it was impossible to know what kind of anguish the boy felt, his "responses" constituted some evidence that he was conscious, and therefore justified the jury's $50,000.00 award. *Id.* at 38.

In the instant case, the record clearly reflects that Wally consciously felt severe pain for at least fifteen minutes after being struck by appellant's vehicle. In addition to the physical pain, the child was certainly terrified as a result of the situation he found thrust upon himself. Given the evidence of pain, his youth, and the inferred mental anguish that he suffered, we cannot say that the award of $600,000.00 was manifestly unjust. Point fourteen is overruled.

The judgment of the trial court is AFFIRMED.

UTTER, Justice, dissenting.

I respectfully dissent. I believe that the amounts of damages awarded for loss of society and mental anguish are excessive, and I would order a remittitur or that the case be reversed and remanded for new trial.

In points of error six through thirteen, appellants complained of the inadequacy of the evidence to support the award of damages for loss of society and mental anguish and additionally claimed that if there is evidence to support the award, the amounts found by the jury are excessive.

In *Larson v. Cactus Utility Co.*, 730 S.W.2d 640 (Tex.1987) and *Pope v. Moore*, 711 S.W.2d 622 (Tex.1986) our Supreme Court clarified the standard of review for actual damages. The amount of actual damages is a fact question and the remittitur of an actual damage award is proper only where the evidence is factually insufficient to support the award. In *Larson*, 730 S.W.2d at 641, and *Pope*, 711 S.W.2d at 624, the Supreme Court stated that a court of appeals should examine all the evidence in the record to determine whether there is sufficient evidence to support the award; if remitting, the Court of Appeals should state clearly why the jury's award is so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986). Therefore, as far as actual damages are concerned, we are not concerned with evidence of passion, prejudice, or other improper motive by the jury in determining remittitur of actual damages. *Pope*, 711 S.W.2d at 624.

While the above-stated standards are clear cut and a logical extension of the standard for review which has been in place for almost 100 years, the Supreme Court's decision in *Moore v. Lillebo*, 722 S.W.2d 683 (Tex.1986), has made the application of this test to damages for loss of society and mental anguish in wrongful death cases difficult, if not impossible. In *Moore*, the Supreme Court held that mental anguish is to be defined "as the emotional pain, torment, and suffering that the named plaintiff would, in reasonable probability, experience from the death of a family member." The court then went on to define loss of society "as the positive benefits flowing from the love, comfort, companionship, and society the named plaintiff would, in reasonable probability, experience if the decedent lived." The Court then went on to hold that:

> "in awarding damages for mental anguish and loss of society and companionship in a wrongful death case, the trier of facts shall be instructed that it may consider (1) the relationship between the husband and wife; or a parent and child; (2) the living arrangements of the parties; (3) any absence of the deceased from the plaintiff for an extended period; (4) the harmony of the family relation; and (5) interest in activities."

Reduced to a more discernible definition the Supreme Court said in *Moore* that if proof of a family relationship establishes some evidence of mental anguish and loss of companionship in a wrongful death case. This was a departure from the previous policy which required some actual physical manifestation of injury accompanying claims for mental anguish and loss of society. Such claims frequently involve the testimony of physicians and psychiatrists concerning actual physical and mental illness resulting from the loss. This was the so called "physical manifestation" requirement for mental anguish recovery. Recognizing the *Moore* evidentiary requirements, I will now review the evidence of damages in this case.

First, I turn to the testimony of Lydia Castro. She testified she was at home when a little boy told her that something had happened to her son Wally and that they had taken him to the hospital. She stated that she just grabbed the keys and took off. "I don't know how I got there." She stated that when she got to the hospital, she saw her son lying straight, she opened the door and started crying, then he saw her and started crying. Then she heard her son screaming. There was no other testimony from her or any other lay witness concerning any emotional pain, torment, or suffering that she may have suffered in the past, present, or future.

Approximately one month before trial, her attorney sent her to Dr. Ramirez, a clinical psychologist. Dr. Ramirez spent approximately two hours in an evaluation conference with Lydia Castro, Ofelia Castro, Wally's grandmother, Eduardo Guajardo, Wally's father, and Simon Garcia, Lydia's present husband. Dr. Ramirez testified that the family was very defensive and that his results were gained more from feelings he had after interviewing Lydia. In answer to counsel's question of whether or not the attributes or symptoms which

Lydia displayed might have been exhibited prior to the accident, Dr. Ramirez replied:

I feel very strongly, in all psychological probability, that even if these conditions did exist, I don't feel they existed at this level. The type of individual that almost like a histrionic personality but not quite, where she felt everything revolved around here. She brought a lot of attention to herself.

However, when I specifically asked questions about her son, she would change; her son, she would say to me, is my whole life, is my whole world, which I don't know how true that would be, but outraged with the fact that the son did not exist anymore.

Now, whether it was out of guilt of not being able to be a better guardian or better provider, I don't know. But I do believe that this incident has brought whatever was brewing in there previously, just brought it up to the surface. She is a very intensified, very angry individual.

In answers to counsel's question, Dr. Ramirez further testified:

The prognosis, as I wrote here in the report, is poor to fair. I feel that psychotherapy would be very beneficial, but she is very resistant, she's very angry, she has intensified feelings of frustration with this whole case, this whole matter. I don't know how good of a candidate she would be for psychotherapy. Her lack of sophistication, intellectual ability, I don't know how good of a candidate she would be for that.

The prognosis, I guess, poor or poor to fair. It's not as good as the grandmother, and even I don't think it's as good as her ex-husband's.

The testimony of Lydia regarding her reactions when she first heard of Wally's injuries and at the hospital plus Dr. Ramirez' testimony of her frustrations apparent in her evaluation interview is the only testimony in this record to support an award of $200,000 for past mental anguish and $200,000 for future mental anguish. There was no testimony from Lydia's mother, her present husband, Wally's father, friends, relatives, or priests to show any emotional pain, torment, or suffering, past, present, or future. I believe the awards for past and future mental anguish are not supported by the evidence and, are excessive. I would require a remittitur of $150,000 for past mental anguish. I would order a remittitur of $100,000 for future mental anguish.

Additionally, the jury awarded the sum of $100,000 for past loss of society and $300,000 for future loss of society. Lydia's testimony showed that Wally was born on September 5, 1978 and that she, Wally and his father lived together for about one year. In 1979, she and Wally's father separated and she and Wally lived with her mother Ofelia. In 1981, Lydia, Wally and her present husband moved to Dallas where they stayed for approximately two years. They then moved to Edna and in May 1985 they moved back to Weslaco. At that time, Wally moved in with his grandmother, Ofelia. Lydia testified that Wally was only supposed to stay with her mother until school started in September, 1985. Wally was still living with his grandmother when school opened on September 5th, the day he was killed. On direct-examination, Lydia testified:

Q. And even though school had started, you up to that day had not any discussion with your mother about living with you again?

A. No.

When asked about Wally's living with his grandmother, Dr. Ramirez testified:

Q. When did they indicate that the little [boy] had started living with Ofelia?

A. In '85. Moved back to Weslaco from Dallas, wanted to stay with grandmother, the little boy wanted to live with his grandmother.

\* \* \* \* \* \*

Q. Did they talk to you about the fact that this little boy was living at the time with his grandmother?

A. Yes, I think they were saying that the little boy was living with his grandmother.

Q. Did you ask them about that situation, why that was?

A. I think what the response was, in the mother's case, that the little boy felt very comfortable with his grandmother—his grandmother would take him in. That arrangement was an arrangement that everyone seemed to be agreed.

In referring to Wally and his living with her, Ofelia Castro referred to Wally as "my son" or "my child." In addition, Ofelia Castro never testified that Wally was only going to stay with her until school started.

The only other evidence offered to support Lydia's claim for damages for loss companionship and society was a group of pictures taken at different birthday parties Lydia had given for Wally. Other than these pictures, there was no testimony or evidence of love, affection, nurture, caring, the harmony of family relationships, or common interest and activities in the past. Except for the natural society and companionship which the evidence showed existed in the past and a presumption that some type of relationship would continue in the future, there is absolutely no evidence of loss of companionship and society in the future. I do not believe that there is sufficient evidence in the record of this case to sustain the amounts awarded to Lydia Castro for the loss of companionship and society of her son. I would require a remittitur of $50,000 for past loss of society and companionship. I would require a remittitur of $200,000 for loss of society and companionship in the future.

The jury also awarded Wally's father Eduardo Guajardo the sum of $60,000.00 for future loss of society and $100,000.00 for future mental anguish. Eduardo Guajardo did not testify at trial or by deposition. Lydia Castro, when asked whether Eduardo saw Wally after she separated from him and was living with her mother presumably from 1979 until 1981 when she moved to Dallas with Simon Garcia, testified:

Q. What about before you went to Dallas, I believe you said you lived—you

and Wally lived with your mother there in Weslaco.

A. Yes.

Q. All right. And that was for a couple of years?

A. Yes.

Q. During that time did Wally's father have an opportunity to see Wally?

A. He used to see Wally, yes.

Q. Okay. Would that be when you or your mother would take Wally to see him?

A. Right.

Q. He didn't some (sic) pick him up at your house?

A. No.

Lydia further testified:

Q. Did Wally ever talk about his father?

A. Not to me.

The only other testimony concerning the relationship between Wally and his father, Eduardo Guajardo came from Dr. Ramirez. The sum of Dr. Ramirez' testimony was best stated as follows:

The feeling that I got is that—and the feeling they wanted to give me was that they had a good relationship. The father had a very good relationship with the boy. Seeing the intensified negative feelings that the father and the mother had, there was some doubt in my understanding that the father could really get that close to the little boy, because the mother refused to even speak to the father and care for the father.

But what was shared with me—what was shared with me, with the father when I talked to him individually, with the uncle of the little boy, that it was positive, it was good, it was as close as could be, considering the circumstances.

Q. How often did they indicate that he was seeing the little boy?

A. I think towards the latter part, maybe one (sic) a month. I think something like that. For the first year is when the parents lived together on a daily basis.

I have searched the entire record and the above testimony is the only testimony regarding the love, comfort, companionship and society between Wally and his father, Eduardo Guajardo. Other than the the love, comfort, companionship and society which would ordinarily flow between a father and son, there is no other testimony which would support such an award. I believe the evidence in this case is not sufficient to sustain the award of $60,-000.00 for loss of companionship and society to Eduardo Guajardo. I would require a remittitur of $30,000 for loss of companionship and society in the past.

Additionally, the jury awarded Eduardo Guajardo the sum of $100,000.00 for future mental anguish. Once again, Eduardo did not testify to any emotional pain, torment, or suffering nor did any relative or friend on his behalf. The only testimony in this record was again given by Dr. Ramirez, taken at the time of the evaluation examination, when he stated:

But again, according to the evaluation, the evaluation results, the kinds of things that I asked him, I felt that he was under a great deal of distress at the moment. he apparently seemed to be very uncomfortable in that evaluation session with his ex there and the family there. But according to my results, I felt that he was very disturbed over the accident of his son, and a fully, major—and a full-blown major depression like his wife, or Lydia, was exhibiting, was not seen.

Once again, there was only a showing of the natural grief and mental anguish that one parent would be expected to suffer from the death of a son. There was no other evidence of emotional pain, torment or suffering, sufficient to justify an award of $100,000.00. I would require a remittitur of $50,000 for loss of society and companionship in the future.

Appellee, in its reply brief, refers to the testimony of a Dr. Everett Dillman as some evidence of the amount of loss of love and society suffered by the parties. Dr. Dillman testified that the amount of $157,000 was a *benchmark* figure for loss of love

and society in a generic situation for a family similarly situated to the family involved herein. However, no attempt was made by the appellee to connect any of Dr. Dillman's testimony to the facts of this case. No hypothetical questions were asked of Dr. Dillman, and no expert opinion was given to the facts applicable to Wally's relationship to his parents or theirs to him, to sustain Dr. Dillman's opinion on loss of society. In addition, there was no evidence introduced to show that Wally ever helped his mother with household chores, therefore, Dr. Dillman's estimate of $86,000 for the loss of Wally's household services is without foundation in this record. Dr. Dillman's testimony constitutes no evidence of the amount of loss of love and society suffered by the parties in this case.

The last item of damages which concerns me is the award of $600,000 for the conscious pain and mental anguish suffered by the deceased immediately before his death. The time sequence after the accident is from 6:08 p.m. until 6:15 p.m. Upon her arrival at the hospital Lydia testified that she saw her son and heard him screaming. When asked how long she was at the hospital, Lydia stated she didn't know. She was not asked to estimate the amount of time she was in the hospital, nor were any hospital records introduced to show the time of death. Other than showing that the accident happened at approximately 6:05 p.m. and Lydia was called to the hospital at 6:15 p.m., there was no showing of the amount of time that Wally suffered physical pain.

Appellee's brief refers to the testimony of one of the witnesses to the accident that he saw the child awake and moaning in pain after he was struck by the truck. One witness did testify that the child was moaning softly but also testified that the child was not moving as if he was in pain. Nothing in the record attempts to frame this testimony with the time sequence of the accident and the child's death. Lydia also testified that after the accident, she saw the deceased and that his eyes were open and that he was in pain. There is no reference to the point in time of this observation and the child's death in the record either.

No death certificate showing the time of death was offered into evidence. There was no testimony from a doctor, nurse, or other hospital personnel to show any conscious pain or mental anguish sustained by Wally. Under the testimony presented, I believe the evidence is not sufficient to sustain the award of $600,000 for conscious pain and mental anguish. I would require a remittitur of $400,000.

It appears to me the majority opinion misconstrues the holding of our Supreme Court in *Moore v. Lillebo*, 722 S.W.2d 683 (Tex.1986). In *Moore*, the Supreme Court simply held that it is not necessary to prove a physical manifestation of mental anguish damages. Nowhere in the opinion does the Supreme Court hold, as the majority does, that the role of review of such damages by the Court is no longer the sufficiency of the evidence. Taken to its illogical conclusory extreme, the majority's review standard would mean that a $50 million award for a broken finger would have to be upheld if someone testified that a broken finger caused mental anguish and the jury found $50 million in damages. There is simply no basis for such a rationale in the current common law of this state. In both *Larson* and *Pope*, the Supreme Court reaffirmed its position that the standard of review for all actual damages is sufficiency of the evidence. The evidence must be sufficient to support the amount of the award of damages. In neither of these cases nor *Moore* was any exception carved to the general rule for mental anguish damages. In applying the *appropriate* standard of review to the mental anguish damages in this case, I would find the evidence was not sufficient to support the amount of damages awarded in this case.

I would order a remittitur in the total amount of $980,000.00. If the remittitur is not offered by the appellee, I would order the case reversed and remanded for a new trial.