UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

_____

No. 91-4387
_____


MARILYN WELLBORN, Individually and
as Administratrix of the Estate of
Bobby Wellborn, deceased,

                              Plaintiff-Appellee
                              Cross-Appellant,

              VERSUS

SEARS, ROEBUCK & CO.,

                              Defendant-Appellant,

              and

THE CHAMBERLAIN GROUP, INC.,

                              Defendant-Appellant
                              Cross-Appellee.

_____

Appeal from the United States District Court
    for the Eastern District of Texas
_____
              (August 21, 1992)

Before BROWN, GARWOOD and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

     This diversity case is a products liability action involving

an automatic garage door opener manufactured by the Chamberlain

Group, Inc. (Chamberlain) and distributed by Sears, Roebuck & Co.

(Sears).  Marilyn Wellborn (Wellborn) brought this action against

Sears and Chamberlain after her son was killed as a result of the

garage door opener malfunctioning.  We affirm in part and certify

the question))Does a decedent's cause of action under the Texas

Deceptive Trade Practices-Consumer Protection Act survive under the Texas Survival Statute))to the Texas Supreme Court.

## I

In late 1986, Wellborn bought a Chamberlain automatic garage door opener from Sears. Wellborn's friend, Jerome Smith (Smith), installed it in Wellborn's garage in April or May of 1987. While installing the opener, Wellborn and Smith studied the owners' manual,[1] and then they performed the test outlined in that manual. Testing the garage door opener, however, Wellborn and Smith used a "two by four" instead of the one-inch obstacle described in the owners' manual.[2] Moreover, subsequent to installing the opener in 1987, Wellborn did not perform the annual test to determine whether any further adjustments to the opener were necessary.

Wellborn often worked the night shift and, on those evenings, she left her fourteen-year-old son, Bobby, at home without supervision. During the evening of November 2, 1988, Wellborn telephoned Bobby at home but he did not answer. She then tele-

---

[1] The manual contained the following rule in bold-faced print:

The Safety Reverse System Test is important. . . . The garage door *must* reverse on contact with a one inch obstacle placed on the floor. Failure to properly adjust the opener may result in serious personal injury from a closing garage door. Repeat the test at least once a year and make any needed adjustments.

Record Excerpts, tab 7, at 3, *Wellborn v. Sears, Roebuck & Co.*, No. 91-4387 (5th Cir. filed August 15, 1991) ["Record Excerpts"].
    Another rule advised: "Do not use force adjustments to compensate for a binding or sticking garage door. Excessive force will interfere with the proper operation of the safety reverse system or damage the garage door." *Id*.

[2] *See supra* note 1.

phoned Smith and, at her request, Smith went to the Wellborns' home. There, Smith found Bobby pinned underneath the garage door with his skateboard next to his feet. Smith activated the automatic garage door opener, and the garage door rose.

Investigating officers subsequently arrived at the Wellborns' and tested the garage door and the opener: They placed their hands under the door about two feet from the ground, and found that the garage door worked properly. When the officers tested the garage door in the same manner from about eight inches, however, the garage door did not reverse. An expert later determined that the garage door did not reverse because of faulty installation. The force adjustments had been set to maximum and the length of the door arm was too short.

In November of 1989, Wellborn brought this suit against Sears and Chamberlain.[3] At trial, the parties offered evidence as to how the accident occurred. Wellborn testified that Bobby was aware of the dangers of getting beneath garage doors and that Bobby knew that the garage door opener was a piece of machinery designed to raise and lower the garage door. One of the Wellborns' older neighbors testified that she had observed Bobby playing a "game" where he raced under the closing garage door. The investigating officer and another expert agreed that the accident's probable

---

[3]     Wellborn asserted causes of action pursuant to the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code Ann. § 17.41, *et seq.* (DTPA), strict liability, negligence, the Texas Wrongful Death Statute, Tex. Civ. Prac. & Rem. Ann. § 71.002 (West 1986), and the Texas Survival Statute, Tex. Civ. Prac. & Rem. Code Ann. § 71.021 (West 1986).

cause was Bobby's attempt to race the closing door on his skate-board.[4] The defendants' experts testified that the blunt trauma to Bobby's forehead probably meant that Bobby hit his forehead on the concrete driveway and was knocked unconscious and that the garage door then struck Bobby's back, which restricted his ability to breathe. According to Wellborn's experts, Bobby struggled to free himself, and remained conscious for a minimum of three to five minutes))possibly as long as several hours. Bobby eventually lost consciousness and died.

Following trial, the jury, finding that Wellborn and Bobby were not contributorily negligent, returned a verdict in favor of Wellborn. The district court accepted the verdict and rendered judgment. Sears and Chamberlain then moved for judgment notwithstanding the verdict, for a new trial, for remittitur, and to alter or amend the judgment. The district court denied the motion for judgment n.o.v., for a new trial, and to alter or amend the judgment. However, because Wellborn did not provide Chamberlain with proper statutory notice, the district court granted the defendants' motion for remittitur in part, thereby deleting the additional DTPA additional damages awarded against Chamberlain.

**II**

This appeal raises the following issues:

---

[4] They testified that Bobby, who was wearing cleats, probably lost his balance while skateboarding at the lip of the garage door where there is a seam and a slight drop as the pavement changes from a rough to a smooth surface.

**(a)** whether the evidence supports the jury's finding that Bobby and Wellborn were not contributorily negligent;

**(b)** whether the district court correctly applied the statute of limitations;

**(c)** whether Bobby is a consumer under the DTPA;

**(d)** whether a cause of action under the DTPA survives to the consumer's estate;

**(e)** whether the jury's awards were excessive; and

**(f)** whether the DTPA's notice requirement requires actual notice to the defendant.

### A

Sears and Chamberlain challenge the sufficiency of the evidence to support the jury's finding that neither Bobby nor Wellborn was contributorily negligent. They contend that Bobby's and Wellborn's negligence caused the accident and that they were therefore contributorily negligent. Wellborn, on the other hand, contends that the jury's findings that she and Bobby were not contributorily negligent are supported by the evidence.

Because the defendants failed to move for a directed verdict on this issue, we are foreclosed from reviewing the sufficiency of the evidence supporting the jury's findings that neither Bobby nor Wellborn was contributorily negligent. *See Wells v. Hico Indep. Sch. Dist.*, 736 F.2d 243, 249 (5th Cir. 1984), *cert. dismissed*, 473 U.S. 901, 106 S. Ct. 11 (1985) ("This Court has held repeatedly that the sufficiency of the evidence supporting jury findings is normally not reviewable on appeal unless the party seeking review has made a motion for a directed verdict in the district court."), *citing Little v. Bankers Life & Casualty Co.*, 426 F.2d 509, 510

(5th Cir. 1970) ("In this Circuit it is well established that the sufficiency of the evidence supporting . . . the jury's findings is not reviewable on appeal unless the party seeking review has made a motion for a directed verdict in the trial court."); *Quinn v. Southwest Wood Products, Inc.*, 597 F.2d 1018, 1024 (5th Cir. 1979). Where the moving party has failed "to preserve the issue of sufficiency of the evidence for appellate review, our inquiry is limited to whether there was any evidence to support the jury's verdict, irrespective of its sufficiency, or whether plain error was committed . . . ." *Hall v. Crown Zellerbach Corp.*, 715 F.2d 983, 986 (5th Cir. 1983) (citations and quotations omitted); *see also Little*, 426 F.2d at 511 ("Our consideration is limited to whether plain error has been committed which, if not noticed, would result in a manifest miscarriage of justice.") (citations omitted). We determine, therefore, whether there was any evidence to support the jury's findings that neither Bobby nor Wellborn was contributorily negligent.

The record does contain evidence that Bobby and Wellborn were not contributorily negligent. First, Wellborn and Smith read the owners' manual, Smith installed it according to the directions, and they both tested the reversal mechanism with a "two by four" to ensure it was functioning properly. Second, Wellborn always used the garage door opener according to the directions in the owners' manual. Third, Wellborn testified that she had specifically warned Bobby not to leave any bicycles or other items under the garage

-6-

door.[5]  Fourth, Bobby's and Wellborn's conduct was not inconsistent with their knowledge of the risks posed by the garage door opener.[6] The garage door opener was expressly represented and designed by the defendants to reverse "if anything interferes with door travel".[7]  The owners' manual did not state or could anyone have inferred from it that the garage door was less likely to reverse after striking a playing child than it would after striking a one-inch obstacle.  Bobby and Wellborn had no knowledge of the risks actually posed by the garage door.  We find, therefore, that there

---

[5]     Specifically, Wellborn testified as follows:
Q  [Y]ou warned Bobby not to leave any bicycles or other items under that door?
A  Yes . . . .
                    * * *
Q  And you believe Bobby was mature enough to understand not to get under the door?
A  That's right.
Q  And you, I believe, believed Bobby was bright enough not to play games with the door or do things around the door that would entail getting under it while it was closing?
A  Yes, I thought he was.
Record on Appeal, vol. 5, at 80, *Wellborn v. Sears, Roebuck & Co.*, No. 91-4387 (5th Cir. filed June 12, 1991) ["Record on Appeal"].

[6]     For example, in a 1985 letter to Chamberlain, the Consumer Product Safety Commission warned:  "The risk to youngsters from automatic garage door openers may be even more treacherous because so many parents are themselves wholly unaware that they can prove to be fatal `playthings.'"  Supplemental Record Excerpts, tab 2, *Wellborn v. Sears, Roebuck & Co.*, No. 91-4387 (5th Cir. filed Sept. 30, 1991) ["Supplemental Record Excerpts"].  Wellborn also testified that she believed the garage door would reverse when something obstructed its path, and that she was unaware of the possibility that the garage door could kill someone.

[7]     Supplemental Record Excerpts, tab 1, at 19.  The note states:
    Door STOPS in UP direction if anything interferes with door travel.  Door REVERSES in DOWN direction if anything interferes with door travel (including binding or unbalanced doors).

is evidence to support the jury's findings that neither Bobby nor Wellborn was contributorily negligent.

## B

Defendants contend that Wellborn's DTPA action is barred by the statute of limitations and, accordingly, there is no basis for awarding DTPA additional damages and attorney fees.  Defendants reason that, after they plead the statute of limitations as a defense, Wellborn failed to meet her burden of pleading the discovery rule.  Wellborn argues that she properly plead the discovery rule[8] before the district court.

Citing *Woods v. William F. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex. 1988), the defendants argue that, pursuant to Texas law, Wellborn))as the party seeking to avail herself of the discovery rule))must plead that rule in federal court.[9]  While Texas law does supply the applicable statute of limitations in this diversity case, "federal law governs the pleading requirements of a case in

---

[8]     A two-year statute of limitations governs actions brought under the Texas DTPA.  Tex. Bus. & Com. Code Ann. § 17.565 (West 1987) ("All actions . . . must be commenced within two years after the date on which the false, misleading, or deceptive act or practice occurred . . . .").  The discovery rule under the DTPA provides, however, that suit may be brought "within two years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice."  *Id*.

[9]     The Texas Supreme Court has held that the plaintiff has the burden in a DTPA case both to plead and to secure favorable findings on her discovery rule theory:  "A plaintiff seeking to avail itself of the discovery rule must . . . plead the rule . . . [and] must also bear the burden of proving and securing favorable findings thereon."  *Woods v. William F. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex. 1988); *see also Dick Poe Motors v. Dickey*, 802 S.W.2d 739 (Tex. App.))El Paso 1990, writ denied).

federal court." *Simpson v. James*, 903 F.2d 372, 375 (5th Cir. 1990), *citing J.M. Blythe Motor Lines Corp. v. Blalock*, 310 F.2d 77 (5th Cir. 1962). "Under Rule 8 of the Federal Rules of Civil Procedure, it is enough that the plaintiff plead sufficient facts to put the defense on notice of the theories on which the complaint is based." *Id.; see also* Fed. R. Civ. P. 8.

We find that Wellborn plead and produced sufficient facts to put the defendants on notice of her reliance on the discovery rule. The facts alleged in her complaint and the evidence at trial indicates that Wellborn bought the garage door opener in late 1986 and, after reading the owners' manual, installed it in April or May of 1987. Nothing that Wellborn saw or did during the installation indicated to her that the door was not capable of reversing after encountering an obstruction. Bobby was injured and died on November 2, 1988. Wellborn filed suit on November 30, 1989))approximately thirteen months following Bobby's death. Throughout the trial, there was testimony regarding the fact that, prior to Bobby's accident, neither Wellborn nor Bobby was aware of the possibility that the garage door could restrict an individual and cause fatal injuries.[10] Accordingly, we hold that the district court properly found that Wellborn's claims were not barred by the statute of limitations because neither Wellborn nor Bobby discovered, or should have discovered, that the garage door opener would not function properly until November 2, 1988.

---

[10] Wellborn testified that it was Bobby's death that made her realize that the garage door would not necessarily reverse.

## C

The defendants contend that, because Bobby neither sought nor acquired the garage door opener for purchase or lease, Bobby does not meet the DTPA's definition of "consumer".[11] Instead, the defendants argue, Bobby was a "mere incidental user of the garage door opener))he was not even licensed to drive [and therefore] he could not use the garage door opener for its primary purpose." Appellants' Brief at 26, *Wellborn v. Sears, Roebuck & Co.*, No. 91-4387 (5th Cir. filed Aug. 15, 1991) (citation omitted) ["Appellants' Brief"]. We disagree.

The DTPA provides that a consumer is entitled to recover both actual and additional damages plus attorney fees. *See* Tex. Bus. & Com. Code Ann. § 17.50 (West 1987 and Supp. 1992). A "consumer" is defined as one "who seeks or acquires by purchase or lease . . . any goods or services . . . ." *Id*. § 17.45(4) (West 1987). The Texas Supreme Court has liberally construed terms of the DTPA in order to effectuate the Act's comprehensive application. *See, e.g., Kennedy v. Sale*, 689 S.W.2d 890, 892 (Tex. 1985), *quoting Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 541 (Tex. 1981) ("The Act is designed to protect consumers from any deceptive trade practice made in connection with the purchase or lease of any goods or services. To this end, we must give the Act, under the rule of liberal construction, its most comprehensive application possible without doing any violence to its terms.") (citation omitted).

---

[11] The defendants concede that Wellborn is a consumer and is entitled to maintain a DTPA action.

Direct contractual privity between an individual and the defendant is not a consideration in determining an individual's status as a consumer under the DTPA. *See Kennedy*, 689 S.W.2d at 892-93 (citation omitted). Standing as a consumer is established in terms of the individual's "relationship to the transaction, not by a contractual relationship with the defendant." *Birchfield v. Texarkana Mem. Hosp.*, 747 S.W.2d 361, 368 (Tex. 1987). Thus, one may acquire goods or services that have been purchased by another for the plaintiff's benefit.

In *Kennedy*, the Texas Supreme Court expressly held that one need not have been a purchaser in order to qualify for consumer status under the DTPA. *See Kennedy*, 689 S.W.2d at 892-93. *Kennedy* held that an employee covered by group insurance purchased by his employer was a consumer in that he acquired the benefits of the services of the policy due to the coverage of the policy provisions, irrespective of the fact that he did not actually purchase the policy benefits from the agent. *See id*. Subsequently, the Texas Supreme Court extended consumer status to a minor who, through the efforts of her parents, acquired goods and services from the defendants. *See Birchfield*, 747 S.W.2d at 368. *Birchfield* held that the minor acquired goods and services, "regardless of the fact that she obviously did not contract for them." *Id*. at 368 (Citing *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 707 (Tex. 1983) for the proposition that "A plaintiff establishes her standing as a consumer in terms of her

relationship to a transaction, not by a contractual relationship with the defendant.").

Although Bobby did not enter into a contractual relationship with the defendants, he acquired the garage door opener and the benefits it provided. Wellborn did not purchase the garage door opener specifically for Bobby's benefit; nevertheless, Bobby lived with Wellborn and regularly used the garage door opener until the time of his death. Wellborn testified that one of the reasons that she bought the garage door opener was to provide additional security for Bobby on the nights that Bobby was home by himself. Indeed, Wellborn had instructed Bobby to lock the house up at night. Because Bobby acquired the garage door opener when it was purchased for his benefit, installed in his home, and used by him, we hold that, under the facts of this case, Bobby is a consumer.

**D**

Having determined that Bobby is a consumer under the DTPA, we now examine the question whether a cause of action under the DTPA survives a consumer's death.

Three Texas courts of appeals have addressed the question whether a cause of action under the DTPA survives to the estate of a consumer. One court of appeals has ruled against the survivability of a cause of action under the DTPA. *See First Nat'l Bank v. Hackworth*, 673 S.W.2d 218, 220-21 (Tex. App.--San Antonio 1984, no writ) (en banc) (ruling that a cause of action under the DTPA to recover treble damages and attorney fees does not survive a consumer's death). However, two courts of appeals have

-12-

determined that a cause of action under the DTPA survives a consumer's death. *See Thomes v. Porter*, 761 S.W.2d 592, 594-45 (Tex. App.--Fort Worth 1988, no writ) (holding that cause of action under the DTPA, exemplary damages based on the DTPA, and attorney fees under the DTPA all survive consumer's death and may be recovered by the estate of deceased consumer); *Mahan Volkswagen, Inc. v. Hall*, 648 S.W.2d 324, 333 (Tex. App.--Houston [1st Dist.] 1982, writ ref'd n.r.e.) ("We hold that the decedent occupied the status of a `consumer' within the meaning of the Act, . . . and that her cause of action under the Act survived to her heirs and the legal representatives of her estate."), *aff'd* on *reh'g*, 648 S.W.2d 334 (Texas App.--Houston [1st Dist.] 1982) (reaffirming this holding). *Hall*, 648 S.W.2d at 334 reaffirming this holding). The Texas Supreme Court, however, has yet to rule on this issue. Indeed, in 1984, in *Shell Oil Co. v. Chapman*, 682 S.W.2d 257 (Tex. 1984), the Texas Supreme Court expressly "reserve[d] to another day discussion of survival of DTPA damages." *Id*. at 259.

The question of the survivability of a cause of action under the DTPA is an important question of Texas law which is determinative of an issue in this appeal. Because there is no controlling precedent, we certify this question to the Supreme Court of Texas.

**E**

The jury awarded Wellborn $1,002,836 as administratrix of Bobby's estate[12] and $1,275,000 for her pecuniary loss, loss of companionship and society, and mental anguish.[13]  Following the jury's verdict, the defendants moved to remit the actual damages awarded, and the district court denied that motion.  The defendants contend on appeal that the jury's awards to Wellborn are excessive and that this court should remit the jury awards or, in the alternative, remand for a new trial.

This court will not reverse a jury verdict as excessive "except on the strongest of showings."  *Caldarera v. Eastern Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983) (citation and quotation omitted).  Indeed, we will not disturb the jury's award unless we find it to be "entirely disproportionate to the injury sustained."  *Id.; see also Wakefield v. United States*, 765 F.2d 55, 59 (5th Cir. 1985).  A jury's award is disproportionate to the injury sustained if it is so large that it shocks the judicial conscience or it indicates passion, prejudice, corruption, bias, or another improper motive.  *See Caldarera*, 705 F.2d at 784; *see also Pope v. Rollins Protective Servs. Co.*, 703 F.2d 197, 207 (5th Cir. 1983) (This court "will not reverse the jury's verdict unless the award is so large that it shows passion or prejudice or shocks the judicial conscience.").  If we determine that a remittitur is

---

[12]    This award consists of $2,836 in funeral and burial expenses and $1,000,000 for Bobby's conscious mental anguish and pain and suffering.

[13]    The jury awarded Wellborn $50,000 for pecuniary loss, $612,500 for loss of companionship and society and $612,500 for mental anguish.

appropriate, we decide the amount of the remittitur in accordance with the "maximum recovery rule"))which mandates that the jury's verdict be "reduced to the maximum amount the jury could properly have awarded." *Caldarera*, 705 F.2d at 784.

**(1)**

Challenging the jury's $1,000,000 award for conscious pain and suffering experienced prior to Bobby's death, the defendants contend that the evidence establishes that Bobby was not conscious after he fell from his skateboard. Wellborn, however, contends that the record shows that Bobby was conscious before he died and, therefore, recovery for Bobby's pain and suffering should be allowed.

Texas law provides that damages for pain and suffering are recoverable only if the person was aware or conscious after the accident. *See Southern Pac. Transp. Co. v. Luna*, 730 S.W.2d 36, 38 (Tex. App.--Corpus Christi 1987, no writ) ("In Texas, only pain consciously suffered and experienced is compensable."), *citing Burrous v. Knotts*, 482 S.W.2d 358 (Tex. Civ. App.--Tyler 1972, no writ); *Sharpe v. Munoz*, 256 S.W.2d 890 (Tex. Civ. App.--San Antonio 1953, writ ref'd n.r.e.). *Cf. Levinge Corp. v. Ledezma*, 752 S.W.2d 641, 645 (Tex. App.--Houston [1st Dist.] 1988, no writ) ("Damages for pain and suffering during unconsciousness are not allowable."), *citing Canales v. Bank of Cal.*, 316 S.W.2d 314, 318 (Tex. Civ. App.--Eastland 1958, writ ref'd n.r.e.); *see also Guzman v. Guajardo*, 761 S.W.2d 506, 512 (Tex. App.--Corpus Christi 1988, writ denied) ($600,000 award upheld where decedent "consciously felt

-15-

severe pain for at least fifteen minutes after being struck");
*Missouri Pac. R.R. v. Lane*, 720 S.W.2d 830, 833 (Tex. App.-- Texarkana 1986, no writ) ($19,500 award upheld for pain and suffering due to terror and anguish decedent suffered for six to eight seconds); *Gulf State Util. Co. v. Reed*, 659 S.W.2d 849, 855 (Tex. App.--Houston [14th Dist.] 1983, writ ref'd n.r.e.).

The parties have presented conflicting evidence as to whether Bobby was conscious after he was struck by the garage door. The defendants argue that the evidence establishes that Bobby lost his balance while on his skateboard, which caused him to fall face down, suffer a contusion on his forehead, and lose consciousness before the garage door descended on his back.[14] Wellborn points to evidence which shows that Bobby was conscious after he fell from his skateboard and was struck by the garage door. Wellborn's expert testified that he thought that Bobby was conscious for approximately three to five minutes after the fall.[15] The coroner, who arrived at the Wellborns' and pronounced Bobby dead, recorded on Bobby's death certificate that Bobby had been alive for approximately thirty minutes following the accident.[16] Even the

---

[14]    *See* Record on Appeal, vol. 8, at 206-07, 232-33.

[15]    *See* Record on Appeal, vol. 8, at 76, 103-04.

[16]    The coroner testified:
I put down on the death certificate that he had been alive about 30 minutes. How long he was alive, I don't know, but he had))he had apparently vomited and he had apparently))I remember))I have some notes, and it has `mucous on his face.' I got the impression that he had))stuff had run out of his nose and mouth. And there was a, for want of a better word, there was a wallowing where he had lain, or laid, . . . That indicated to me

-16-

defendants' pathologist conceded that, if Bobby was conscious under the garage door, it could have possibly taken several hours for Bobby to die.[17]  We find that the evidence is sufficient to support the jury's $1,000,000 award for the conscious pain and suffering Bobby experienced prior to his death.

## (2)

Next, the defendants make a global challenge to the jury award for Wellborn's pecuniary loss, loss of companionship and society, and mental anguish, contending that the jury's awards can only be explained by passion or prejudice.

In wrongful death cases, Texas law provides for the recovery of damages for mental anguish and loss of society and companionship and, in awarding such damages, the jury "may consider (1) the relationship between husband and wife, or a parent and child; (2) the living arrangements of the parties; (3) any absence of the deceased from the beneficiary for extended periods; (4) the harmony of family relations; and (5) common interests and activities." *Moore v. Lillebo*, 722 S.W.2d 683, 688 (Tex. 1986); *see also Guzman*, 761 S.W.2d at 510, *citing Moore*, *supra*.  Awards for mental anguish should compensate for the "emotional pain, torment, and suffering"

---

that he had gotten caught, had perhaps gotten excited, he had thrown up, exuded something from his nose, and in the process of being stuck, and I would presume it))I don't))I don't know what to assign it to, but he got so excited by the fact perhaps that he couldn't get out, that's some speculation to that, is that he wallowed back and forth and made this big wallow of wet material that came out of his mouth and nose on the ground.
Record on Appeal, vol. 9, at 93-94.

[17]    *See* Record on Appeal, vol. 8, at 244.

experienced due to the death of a family member.  *See Moore*, 772 S.W.2d at 688; *Lane*, 720 at 833 (Texas allows for "a recovery for termination of the parent-child relationship and the resulting mental anguish . . . .") (citations omitted).

The evidence is sufficient to support the jury's award for Wellborn's loss of companionship and society and for mental anguish.  Since her divorce in 1979, Wellborn has acted as Bobby's sole caretaker.  Bobby and his mother had a very close relationship and took part in many activities:  the evidence indicates that they fished, rode horses and shot firearms together.  At trial, Wellborn described Bobby as a thoughtful child and she introduced many cards and letters Bobby had written to show his thoughtfulness.

The record establishes that Bobby's death had a profound impact on Wellborn.  Following Bobby's death, Wellborn initially missed some time from work, and when she was at work she had a hard time.  At first, she couldn't sleep at all, and her doctor prescribed medication for her.  The record also shows that Wellborn attended group therapy sessions following Bobby's death.  The evidence also reveals that Wellborn was still affected by Bobby's death more than two years after the accident.  For example, at the time of trial, Wellborn periodically missed time from work.  And, Wellborn keeps Bobby's room virtually the same as it was before his death.  Wellborn visits Bobby's grave almost daily and places paper flowers on his grave that she made.  The record reflects that Bobby and Wellborn had a very close relationship and that Bobby's death was especially difficult for Wellborn.  We find that the evidence

is sufficient to support the jury's $1,225,000 award to Wellborn for her mental anguish and loss of society and companionship.

The evidence is also sufficient to support the jury's $50,000 award for Wellborn's pecuniary loss. Wellborn offered evidence that Bobby regularly worked around the house, fed and cared for the farm animals.[18] *See General Motors v. Grizzle*, 642 S.W.2d 837, 843 (Tex. App.--Waco 1982, writ dismissed) (In the wrongful death action of a minor child, "[d]amages awarded surviving parent . . . must be based on the pecuniary value of the minor child's services until he reaches majority and such sums as might reasonably be expected as contributions after the child reaches majority, minus the cost and expense of the child's care, support, education, and maintenance.") (citation omitted). We find that the evidence is also sufficient to allow Wellborn's recovery for her pecuniary loss.

## F

In her cross-appeal, Wellborn challenges the district court's conclusion that she is not entitled to the additional damages the jury awarded against Chamberlain because she did not give Chamberlain proper pre-suit notice.

The DTPA requires that a plaintiff serve the defendant with a demand letter as a prerequisite to filing suit. *See* Tex. Bus. &

---

[18] For example, Wellborn produced evidence that Bobby helped with washing the dishes and he left little messages for Wellborn explaining that he had done the chores that Wellborn had asked him to do. *See* Record on Appeal, vol. 5, at 61. Responding to a question as to the type of chores Bobby would do, Wellborn testified that Bobby would "take out the trash or, you know, feed the horse and the dogs and stuff like that." *Id*. at 50.

Com. Code Ann. § 17.505(a) (West 1987 and Supp. 1992); *see also Automobile Ins. Co. of Hartford v. Davila*, 805 S.W.2d 897, 901-02 (Tex. App.--Corpus Christi 1991, writ denied). "This notice must advise the person of the consumer's specific complaint and the amount of actual damages and expenses, including attorney's fees, if any, reasonably incurred by the consumer in asserting the claim against the defendant." *Davila*, 805 S.W.2d at 901-02, *citing* Tex. Bus. & Com. Code Ann. § 17.505(a). It was therefore Wellborn's burden to provide Chamberlain with proper written notice as a prerequisite to recovering additional damages against Chamberlain.

On August 2, 1989, Wellborn forwarded a notice letter to Sears. Approximately two weeks later, Wellborn's counsel received a copy of a Sears' letter to Chamberlain. In this letter, Sears forwarded Wellborn's claim to Chamberlain and requested that Chamberlain advise Wellborn of its position regarding the claim. Counsel for both defendants subsequently informed Wellborn's counsel that he was representing both defendants on Wellborn's claim and that all correspondence should be sent to him. Wellborn's notice letter to Sears did not inform Chamberlain of any complaint that Wellborn had against Chamberlain. It was addressed to and made complaints against "Sears Roebuck & Co." Wellborn complained of alleged "false, misleading and deceptive acts and a course of conduct by Sears in violation of the DTPA." Supplemental Record Excerpts, tab 3. Wellborn complained that Sears represented and warranted that the garage door opener was safe and efficient, and that Sears was aware of the defect but failed to correct or

warn consumers about the product. Wellborn's DTPA notice letter to Sears did not mention Chamberlain or any conduct by Chamberlain. We find that Wellborn failed to provide Chamberlain the statutorily prescribed written notice. *See Davila*, 805 S.W.2d at 901-02. Therefore, we affirm the district court's deletion of additional damages against Chamberlain.

## III

For the foregoing reasons, we AFFIRM the district court's judgment in its entirety except we CERTIFY the following question to the Texas Supreme Court))Does a decedent's cause of action under the Texas Deceptive Trade Practices-Consumer Protection Act survive under the Texas Survival Statute?