CIGNA HEALTHCARE OF TEXAS, INC., Appellant

v.

Dorothy PYBAS, Individually and as Representative and Heir of the Estate of Herschel Pybas, Deceased; and Shari L. Denton, Individually and as Heir of the Estate of Herschel Pybas, Deceased, Appellees.

No. 05–03–00517–CV.

Court of Appeals of Texas, Dallas.

Feb. 12, 2004.

R. Brent Cooper and Diana L. Faust, Cooper & Scully, P.C., Dallas, for Appellant.

J. Don Gordon, Hynds & Gordon, P.C., Sherman, Nina Cortell, Haynes & Boone, L.L.P., Dallas, and Adam J. Williams, G. Parker Young, Law Offices of George Parker Young, Fort Worth, for Appellee.

Before Justices JAMES, BRIDGES, and RICHTER.

## OPINION

Opinion By Justice JAMES.

CIGNA Healthcare of Texas, Inc. appeals the trial court's judgment entered on the jury's verdict in favor of Dorothy Pybas and Shari L. Denton awarding $3,050,000 in actual damages and ten million dollars in exemplary damages. Appellant brings ten issues, including assertions that the trial court erred by not dismissing the cause for failure to file a timely, proper expert report; the evidence is legally and factually insufficient to support the awards of actual and exemplary damages; and the newly amended post-judgment interest rate should be applied in this case. We modify the judgment to delete the award of exemplary damages and otherwise affirm the trial court's judgment.

## FACTUAL BACKGROUND

In December 1998, eighty-three-year-old Herschel Pybas was admitted to Community Medical Center hospital in Sherman, Texas suffering from severe anemia, congestive heart failure, chronic obstructive pulmonary disease (emphysema), and renal failure. Pybas had a pacemaker, and he had suffered several strokes during the preceding nine years. Pybas's physician, Dr. Nathan Watson, considered Pybas's prognosis poor, but after transfusions to stabilize his congestive heart failure and dialysis treatment for his renal failure, Pybas's condition improved. In late Decem-

ber, Pybas was discharged from the hospital to a skilled nursing facility operated by Integrated Health Services (IHS). During his stay in the hospital, Pybas's strength had declined, and Dr. Watson testified the goal for Pybas at IHS was for Pybas to improve and strengthen to the point he could go home and be cared for by his wife, Dorothy Pybas, and his daughter, Shari Denton. At IHS, Pybas received physical and occupational therapy, including strength training and assistance in walking, treatment for a bed sore from his time in the hospital, as well as monitoring of his numerous health conditions. Due to his emphysema, Pybas received supplemental oxygen through nasal cannula at the rate of three liters per minute. During the first couple of weeks at the facility receiving the therapy, Pybas's condition improved.

To pay for his treatment beginning January 1, 1999,[1] Pybas had MediCare Plus Choice insurance with appellant. At first, appellant approved Pybas's stay at IHS. However, by January 14, Dr. David Seeley, appellant's medical director, had indicated that Pybas might no longer meet the criteria for in-patient skilled nursing care. Nurse Vicki Middleton, who was employed by appellant as its on-site nurse reviewer and patient care coordinator, asked Dr. Watson when Pybas could be discharged home. Dr. Watson, after talking with Dr. Seeley, agreed Pybas could be discharged from IHS to his home by Friday, January 22, if home health care could be arranged. On Thursday, January 21, Dr. Watson noted on Pybas's chart that he was coordinating Pybas's discharge with home health care for Pybas. Dr. Watson also noted Pybas was no longer showing symptoms of congestive heart failure, his renal insufficiency was marginal, and his emphysema was down to occasional wheezes and rhon-

chi with respiratory treatment continuing. That same morning, Dr. Seeley told Nurse Middleton that Pybas should be discharged the next day. Nurse Middleton called IHS, spoke to "Brenda" and told her she expected Pybas would be discharged the next day. Nurse Middleton also called Dr. Watson's office and left a message inquiring about the plan to discharge Pybas the next day. Dr. Watson did not return her call.

On Friday, January 22, Nurse Middleton went to IHS and discovered there was no discharge order for Pybas. The nurse in charge at IHS, Geraldine McKinney, told Nurse Middleton that Pybas could not be discharged without orders from Dr. Watson. When Dr. Watson called the facility, Nurse Middleton spoke to him and reminded him that he and Dr. Seeley had agreed Pybas could be discharged by the end of the week. Dr. Watson agreed Pybas could be discharged home that day provided appellant arranged for home health care, including all medicines and therapy Pybas received at IHS, together with skilled nursing visits. Nurse Middleton agreed to arrange everything. Nurse McKinney got on the telephone and wrote down Dr. Watson's orders for Pybas's discharge. She showed the orders to Nurse Middleton, who told her the orders were too vague. Nurse McKinney spoke further with Dr. Watson, who dictated more complete orders. Nurse Middleton ordered an ambulance to transport Pybas home that night. Nurse Middleton asked Dorothy if there was anything she needed at home for Pybas's care, and Dorothy said she needed a wheelchair. Nurse Middleton contacted Olsten, the home health care provider, and arranged for skilled nurse visits to Pybas's home twice each week and a home health aide three times each week.

---

1. Unless otherwise noted, all January dates are for the year 1999.

Nurse Middleton also contacted Rhema, the durable medical equipment supplier, and ordered the wheelchair, but she did not order supplemental oxygen equipment for Pybas.

Nurse Middleton testified she faxed the telephone orders to Rhema and Olsten on the afternoon of January 22, and that at the time she did so, supplemental oxygen was not listed on the "Telephone Orders" form filled out by Nurse McKinney. The copies in evidence of the telephone orders come from IHS's records and contain an order for supplemental oxygen; however, appellant presented evidence this provision may have been added later, such as when it became known that Pybas's condition had deteriorated over the weekend. Representatives from Rhema and Olsten testified the faxed copies of the telephone orders Nurse Middleton sent them were destroyed after the information was entered on their computers. Nurse Middleton testified that any copy of the faxed orders she may have retained was destroyed when she took all of her files of old cases, including Pybas's, from her house to appellant's office for shredding shortly after suit was filed in this case.

At about 9:00 p.m. on January 22, with an ice storm coming into town, an ambulance arrived at IHS to take Pybas home. The ambulance crew noted Pybas was receiving oxygen at the rate of three liters per minute, but the nursing staff at IHS told the ambulance crew that Pybas would not need oxygen during transportation and that he would not require it at home. The ambulance crew took Pybas home. The effort of walking down the hall of his house left Pybas so exhausted that he was unable to sign the ambulance forms.

Dorothy and Shari thought oxygen would be arriving for Pybas at any time. They had received a telephone call earlier that day from "Vicki" who said "he [Pybas] would have oxygen or anything he would need." However, the oxygen never arrived. Dorothy and Shari did not call either Dr. Watson or IHS about the lack of oxygen because they assumed no one would help them late at night during a winter storm. Without supplemental oxygen, Pybas had a "rough" night.

The next morning, Saturday, January 23, Dorothy and Shari called Dr. Watson and told him the oxygen for Pybas never arrived. Dr. Watson was upset and tried to call Nurse Middleton; however, she had turned off her pager for the weekend on Friday night. Dr. Watson also tried to arrange for oxygen to be sent to the Pybas's home. About noon, however, Dr. Watson told them to call an ambulance and have Pybas taken to the emergency room.

Paramedic Cynthia Lynn arrived and performed a physical assessment of Pybas before transporting him to the hospital. Lynn noted Pybas complained of lower abdominal pain from urinary retention. Lynn recorded Pybas's breathing was "normal" and his lungs were clear. Pybas was fully oriented. Pybas did not complain that he could not get enough air. Lynn checked Pybas's blood pressure three times: at 12:20 p.m., it was 102/50, at 12:35 p.m., it was 112/62, and at 12:45 p.m., it was "110 palpable." The ambulance arrived at the hospital at 12:48 p.m.

In the emergency room, at 1:32 p.m., the triage nurse performed an assessment of Pybas and noted he was lethargic, his respiration was "deminished" [sic] in both the right and left lungs, his blood pressure was 91/54, and his oxygen saturation level was seventy-seven percent. By 3:10 p.m., Dr. Watson had arrived at the hospital and examined Pybas, and Dr. Watson ordered that Pybas receive supplemental oxygen through a face mask.

Pybas was admitted to the hospital that afternoon. After initially improving, Pybas's condition worsened. Pybas, Dorothy, and Shari agreed to a "Do Not Resuscitate" order for Pybas. Pybas died on January 29.

Dorothy and Shari filed suit against appellant for negligence and gross negligence and asserted appellant was liable under chapter 88 of the civil practice and remedies code. In the ensuing jury trial, the jury found: (a) appellant's negligence and lack of ordinary care in making, influencing, participating in, or controlling health care treatment decisions concerning Pybas proximately caused Pybas's injuries, (b) three million dollars would compensate for Pybas's pain and mental anguish, (c) fifty thousand dollars would compensate Dorothy for her past and future mental anguish and loss of Pybas's companionship and society, (d) Shari should take nothing, (e) Pybas's injury resulted from a wilful act or omission or gross neglect, (f) appellant intentionally or knowingly caused serious bodily injury to Pybas, and (g) ten million dollars should be assessed against appellant as exemplary damages. The trial court entered judgment on the verdict and awarded pre- and post-judgment interest at the rate of ten percent per annum.

## APPELLANT'S MOTION TO DISMISS

In its first issue, appellant asserts the trial court erred by denying its motion to dismiss the cause for appellees' failure to comply with the expert-report requirements of civil practice and remedies code section 88.002(k) and revised civil statutes article 4590i, section 13.01. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 88.002(k) (Vernon

Supp.2004); TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01 (repealed 2003).[2]

Chapter 88 of the civil practice and remedies code makes health insurance carriers liable to the enrollees in the carriers' health care plans for damages caused by the carriers' failure to exercise ordinary care when making "health care treatment decisions." TEX. CIV. PRAC. & REM.CODE ANN. § 88.002(a) (Vernon Supp.2004). " 'Health care treatment decision' means a determination made when medical services are actually provided by the health care plan and a decision which affects the quality of the diagnosis, care, or treatment provided to the plan's insureds or enrollees." *Id.* § 88.001(5). Section 88.002(k) requires enrollees filing an action under chapter 88 to comply with the expert-report requirements under revised civil statute article 4590i, section 13.01. *Id.* § 88.002(k).

Article 4590i, section 13.01(a) and (d) requires a patient suing a health care professional for a health care liability claim to file an expert report within either 90 or 180 days of filing the claim, depending on the circumstances. TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(a), (d) (repealed 2003). If the plaintiff fails to comply with the expert-report requirements, the trial court, upon the defendant's motion, shall dismiss the action with prejudice to its refiling and award the defendant his attorney's fees and costs incurred. *Id.* § 13.01(b), (e). The trial court must honor any agreement signed by the parties and filed with the court that extends the time period under section 13.01(a) and (d) for filing the expert report. *Id.* § 13.01(h).

Appellees filed suit on January 19, 2001. Appellees served appellant with the expert

**2.** Act of May 25, 1993, 73d Leg., R.S., ch. 625, § 3, 1993 Tex. Gen. Laws 2347, 2347–49, *amended by* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 985–87, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884 (the provisions of article 4590i, section 13.01 are now codified at TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp. 2004)).

report of Dr. James Berry, M.D. on May 31, 2001. On August 3, 2001, appellant objected to the substance of the report and moved to dismiss the action because the report did not constitute a good-faith effort to comply with the expert-report requirements and 180 days had passed without a proper expert report being filed. The trial court held a hearing on the motion on August 22, 2001 but did not immediately rule on its merits. On October 30, 2001, the trial court denied appellant's motion to dismiss. On December 10, 2001, appellees filed additional "4590i Expert Reports" from Dr. Charles Cefalu, Dr. Linda Peeno, and Nurse Suzanne Frederick.

Appellant argues that Dr. Berry's report was the only timely filed expert report and that it did not meet the requirements of an expert report under article 4590i, section 13.01. Appellant asserts the trial court had no discretion under these circumstances except to dismiss. Appellant's argument does not discuss the effect of a crucial circumstance. On October 23, the week before the trial court denied appellant's motion to dismiss, the parties signed the following Rule 11 agreement:

> This Rule 11 agreement between Plaintiffs and CIGNA HealthCare of Texas, Inc. provides that Plaintiffs are agreeable to postponing the depositions of Dr. David Seeley and Ms Vicki Middleton to accommodate James Johnson's [CIGNA's attorney] and CIGNA HealthCare's schedule, and CIGNA HealthCare is agreeable that any such postponement attributable to James Johnson's schedule or CIGNA HealthCare's schedule (and an additional thirty days after any such postponement) would not be used by CIGNA HealthCare as a basis for challenging the timeliness of any additional expert report that Plaintiffs may file under section 88.002(k) of the Texas Civil Practice and Remedies Code.

The agreement was signed by attorneys for both sides and was filed with the trial court. Section 88.002(k) requires the expert reports required under article 4590i, section 13.01. TEX. CIV. PRAC. & REM.CODE ANN. § 88.002(k) (Vernon Supp.2004). The only expert reports required under article 4590i, section 13.01 are those under subsections (a) and (d). *See* TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01 (Repealed 2003). It thus appears that the parties agreed: (1) that expert reports beyond Dr. Berry's expert report could be considered in meeting the requirements of section 13.01, and (2) to extend the time to file expert reports under section 13.01 through whatever time period is contemplated by the agreement.

█ We interpret this Rule 11 agreement as an agreement under section 13.01(h) to extend the time to file an expert report. The trial court had no discretion except to honor the parties' agreement. *Id.* § 13.01(h). Because appellant's motion to dismiss was based on Dr. Berry's report being the only expert report and because the parties agreed additional reports could be filed and considered by the trial court in making its determination under section 13.01(e), the trial court did not abuse its discretion in denying appellant's motion to dismiss on October 30, 2001. Subsequently, on December 10, 2001, appellees filed the additional expert reports, and appellant did not renew its motion to dismiss. Appellant does not complain that these reports were untimely under the October 23, 2001 Rule 11 agreement or that they fail to meet the requirements for an expert report. Appellant's argument lacks merit. We resolve appellant's first issue against it.

## SUFFICIENCY OF THE EVIDENCE OF NEGLIGENCE CAUSING INJURY

In its second issue, appellant asserts appellees failed to present legally and fac-

tually sufficient evidence to prove by a preponderance of the evidence that appellant's negligence or failure to use ordinary care proximately caused Pybas's injuries.[3] Appellant presents both legal and factual sufficiency challenges under the same argument.

At trial, appellees presented evidence of appellant's common-law negligence and lack of ordinary care under chapter 88 of the civil practice and remedies code by: (1) Nurse Middleton's failure to arrange for supplemental oxygen equipment to be set up for Pybas on his arrival at home; and (2) Dr. Seeley's and Nurse Middleton's insistence that Dr. Watson order Pybas's discharge on a Friday night when Friday discharges are known to be "problematic." Under both negligence and lack of ordinary care, the subsequent harm to Pybas, if any, caused therefrom was due to the lack of supplemental oxygen while at home. Appellant asserts the evidence is insufficient to show the lack of oxygen proximately caused Pybas's injuries.

### Standards of Review

 "In reviewing a 'no evidence' point, we must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary." *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001); *see Wal–Mart Stores, Inc. v. Canchola,* 121 S.W.3d 735, 739 (Tex.2003) (per curiam) (citing *Bradford* ). If there is more than a scintilla of evidence to support the finding, then the no-evidence challenge fails. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002); *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987).

When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Lozano v. Lozano,* 52 S.W.3d 141, 145 (Tex.2001); *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). However, if the evidence supplies some reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, then there is some evidence. *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex. 2003); *Kindred,* 650 S.W.2d at 63.

 In addressing a factual sufficiency of the evidence challenge upon a jury verdict, an appellate court must consider and weigh *all* the evidence, not just the evidence supporting the verdict. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001); *City of Princeton v. Abbott,* 792 S.W.2d 161, 163 (Tex.App.-Dallas 1990, writ denied). The verdict should be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Dow Chem. Co.,* 46 S.W.3d at 242; *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). However, this Court is not a fact finder, and we may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence. *Durban v. Guajardo,* 79 S.W.3d 198, 208 (Tex.App.-Dallas 2002, no pet.); *Clancy v. Zale Corp.,* 705 S.W.2d 820, 826 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).

### Proximate Causation

Appellant asserts there is no evidence that the lack of oxygen on the night of

---

**3.** Jury Question 1 asked, "Did the lack of ordinary care, if any, by CIGNA in making, influencing, participating in, or controlling health care treatment decisions concerning Herschel Pybas, if any, proximately cause Mr. Pybas' injuries in question, if any?" Jury Question 2 asked, "Did the negligence if any, of CIGNA proximately cause Mr. Pybas' injuries in question, if any?" The jury answered "Yes" to both questions. Neither question defined "injuries in question."

January 22 to 23 proximately caused Pybas's injuries other than Dr. Cefalu's testimony, and appellant argues that Dr. Cefalu's testimony did not constitute any evidence. We disagree.

■ Even without Dr. Cefalu's testimony, the record contains the testimony of three other witnesses constituting some evidence that the lack of oxygen injured Pybas. Viewing the evidence in a light that tends to support the disputed finding and disregarding all contrary evidence, *see Wal-Mart Stores, Inc.*, 121 S.W.3d at 739, the record shows the following evidence supports the jury's finding. Dorothy testified that Pybas, without supplemental oxygen, had difficulty breathing that night. Dr. Watson testified, "I think there's probably some degree of connection" between the lack of oxygen following Pybas's discharge on January 22 and his degraded condition on January 23 and his death.[4] Dr. Neil Kurtzman, who specializes in internal medicine and nephrology, testified it was not safe for Pybas to leave IHS without oxygen on January 22, and Pybas's "medical conditioned worsened by the fact that he went home without oxygen."[5] We conclude this evidence constitutes some evidence that the failure to provide supplemental oxygen for Pybas on his discharge from IHS proximately caused injury to Pybas.

■ Appellant asserts Dr. Cefalu's testimony does not constitute evidence of proximate cause. Dr. Cefalu testified he is a geriatrician, board certified in geriatrics. He has treated thousands of elderly persons with Pybas's group of conditions, and he has observed the effect of oxygen deprivation on people in Pybas's condition. Dr.

Cefalu testified he had formed an opinion, based on reasonable medical certainty, of the cause of Pybas's death:

That opinion is that Mr. [Pybas] ... was discharged prematurely on January 22nd from the skilled nursing facility referred to as IHS, and also—and also without adequate support at home, specifically in the form of nasal cannula oxygen that he was both physiologically but particularly psychologically dependant on.

He went for a period of 12 to 16 hours from his discharge at around 9:30 p.m. on the 22nd to when he returned to the hospital the next morning and was admitted around 1:00 o'clock. It is my medical opinion that that period of oxygen deprivation in a patient—in a geriatric patient who—and most commonly we see, who has lost their [sic] margin of reserve.

Much different than you and I who have reserve who are fairly healthy, but in an elderly patient in the geriatric realm who has lost the margin of reserve that you and I have, having heart failure that could be precipitated by an extra glass of water or not drinking that glass of water. In other words, marginal heart failure. Marginal renal failure, that could be worsened by the slightest insult.

A patient who has had a stroke, who has fragile functioning, who has a history of depression and being treated under depression, and then to be left psychologically without oxygen for 12 to 16 hours, the—what we know in studies is that older people don't mind dying necessarily. The social isolation and the

---

**4.** Dr. Watson noted that Pybas "did have other things going on."

**5.** Dr. Kurtzman also testified Pybas's kidney functioning deteriorated between January 22

and 23, which hastened Pybas's death. Dr. Kurtzman testified it was "possible," although unlikely, that the lack of oxygen worsened Pybas's kidney function.

isolation of not having anybody or any support is psychologically devastating. We know that studies in depression in older people show that they die more often and get admitted more often to the hospital when they have depression. So this insult basically tipped that person psychologically into a downward spiral that progressed over a period of days and ended in his death. The isolation, the psychological isolation—he was psychologically dependant on oxygen.

It was that loss, the 12 to 16 hours worsened his depression and caused him to give up. There's the physiological issue of being without oxygen, which I do believe physiologically caused an insult on top of an already fragile patient with stroke, heart failure, renal failure, subsequently tipped this patient, which is described in geriatrics textbooks as a downward spiral, like a snowball going down a hill that just picks up steam.

And the scheming of the poor circulation to the heart that this patient already had from years of the atherosclerosis, the poor circulation to the brain, on top of the fact the patient was chronically anemic with a low blood count, and the loss of oxygen supply may not have been significant to you and I[sic], but was enough to spiral him downhill physiologically. And I think it was that that caused his premature death.

Appellant argues there is no evidence to support the basis of Dr. Cefalu's opinion, namely, that Pybas's depression worsened after being without oxygen. However, Dr. John Severinghaus testified he "would agree that something happened during the 14 hours when [Pybas] was at home that made him considerably worse and may have contributed to his loss of will to live." Dr. Watson testified that when he saw Pybas at the hospital on January 23, Pybas was "very fatigued" and "may have been a little traumatized from having a rough night" and that Pybas "had pretty much given up." Dr. Watson's opinion about the effect of the physical and psychological downturn on Pybas's ultimate demise was consistent with Dr. Cefalu's opinion. Dr. Watson stated, "[T]here is no question in my mind that that—after nursing him along for a whole month in the hospital, finally getting him to a point where he could stand up and start to walk and things were stabilized or—and then to have deteriorations, conditions, a week after that, you know, I think there's probably some degree of connection."

Appellant also argues Dr. Cefalu's opinion that Pybas suffered a "physiological insult" is contradicted by his testimony that he is not a physiology expert and his deferral to Drs. Severinghaus and Kurtzman on this issue. Dr. Cefalu testified he "would have to defer to Dr. Kurtzman on issues of lactic acidosis, metabolic acidosis, acid-based balance." However, Dr. Cefalu's opinion, as set out above, did not involve "issues of lactic acidosis, metabolic acidosis, acid-based balance." Dr. Kurtzman testified it was not within a reasonable medical probability that Pybas suffered *irreversible* tissue damage, but Dr. Kurtzman did not testify that Pybas suffered *no* tissue damage or other injury due to the lack of supplemental oxygen. Dr. Kurtzman testified Pybas's medical condition was worsened by the fact he went home without oxygen and that the change in Pybas's condition from before his discharge from IHS on January 22 to his admission to the hospital on January 23 was caused in part by "lack of oxygen volume contraction." We conclude Dr. Kurtzman's testimony is not inconsistent with Dr. Cefalu's opinion and does not deprive Dr. Cefalu's opinion of all evidentiary weight.

Dr. Severinghaus testified that he was an expert in measuring gases in the blood and the physiological effects of low oxygen levels due to illness, being at high altitudes, etc. Normal oxygen saturation levels are ninety-seven or ninety-eight percent. When Pybas arrived at the hospital on January 23, his oxygen saturation level was seventy-seven percent to eighty-five percent. Dr. Severinghaus testified that being at these oxygen saturations levels for the fourteen hours Pybas was without supplemental oxygen "would not have produced any injury." However, Dr. Severinghaus also testified that, due to his anemia, Pybas had reduced tolerance to low oxygen conditions. Accordingly, Dr. Severinghaus testified, the effect of the eighty to eighty-two percent oxygen saturation reading would affect Pybas's brain like a seventy percent reading, and a seventy-seven percent reading would affect his brain like an even lower reading. Dr. Severinghaus also testified that oxygen deprivation causes the cells to create lactic acid and less carbon dioxide. Pybas's carbon dioxide level in the emergency room on January 23 was normal, indicating Pybas was not suffering hypoxia.[6] However, Dr. Severinghaus testified that Pybas's condition before and shortly after he arrived in the emergency room on January 23, his confusion, orientation only to person, lethargy, shortness of breath, and inability to stand "might be" consistent with a seventy-seven percent oxygen saturation level. Dr. Severinghaus admitted he had never treated, studied, or heard of a patient with Pybas's particular group of problems experiencing that low level of oxygen saturation. Although Dr. Severinghaus testified the lack of supplemental oxygen for fourteen hours did not cause tissue damage, Dr. Severinghaus never ad-

dressed the two tenets of Dr. Cefalu's opinion: that the lack of oxygen "was enough to spiral him downhill physiologically," and that it "tipped [Pybas] psychologically into a downward spiral that progressed over a period of days and ended in his death." Dr. Severinghaus agreed "that something happened during the 14 hours when he was at home that made him considerably worse and may have contributed to his loss of will to live." We conclude Dr. Severinghaus's testimony is not contradictory to Dr. Cefalu's opinion and does not deprive Dr. Cefalu's opinion of all evidentiary weight. Appellant's argument lacks merit.

Appellant also argues the evidence is insufficient to show the lack of oxygen caused Pybas's injuries because Pybas's condition stabilized within hours of his arrival at the emergency room on January 23 to a level better (except for his kidneys) than before his discharge from IHS the previous day. Drs. Kurtzman and Watson testified Pybas's blood pressure, hemoglobin, and hematocrit levels improved, but Dr. Cefalu testified this apparent improvement in these items was due to the transfusions and IVs Pybas received and not to any improvement in his condition. Pybas's breathing, however, was not improved or even the same on January 23 as it was on January 22 as Pybas went from receiving supplemental oxygen through nasal cannula to requiring a face mask to maintain an appropriate oxygen saturation level.

Appellant also argues appellant's death was hastened by Pybas's and his family's decision that he would not undergo dialysis after January 23. However, when Pybas was discharged from IHS, he did not require dialysis. Accordingly, the fact he

---

**6.** Dr. Cefalu testified it would take a few days for the cellular damage and lactic acidosis to appear. Dr. Severinghaus did not expressly address whether lactic acidosis would be immediately measurable or whether it would take time to appear.

did not undergo dialysis does not show appellant's negligence and lack of ordinary care did not hasten Pybas's death.

■■■ After reviewing all the evidence, we conclude the evidence is both legally and factually sufficient to support the jury's finding that appellant's negligence and lack of ordinary care proximately caused Pybas's injuries. We resolve appellant's second issue against it.

## EXCESSIVENESS OF PYBAS'S ACTUAL DAMAGES

■■■ In its sixth issue, appellant asserts the evidence is legally and factually insufficient to support the jury's award of three million dollars to Pybas for the pain and mental anguish resulting from the injuries in question before his death.[7] Mental anguish is defined as intense pain of body or mind or a high degree of mental suffering. *Tex. Farmers Ins. Co. v. Cameron,* 24 S.W.3d 386, 394 (Tex.App.-Dallas 2000, pet. denied) (citing *Phar-Mor, Inc. v. Chavira,* 853 S.W.2d 710, 712 (Tex.App.-Houston [1st Dist.] 1993, writ denied)). It is something more than mere worry, anxiety, vexation, or anger. *Id.* It is more than disappointment, resentment, or embarrassment. *Id.* To recover for mental anguish, the plaintiff must prove such painful emotions as grief, severe disappointment, indignation, wounded pride, shame, despair, or public humiliation. *Id.* A mental anguish damages award requires evidence of a high degree of mental pain and distress that is "more than mere worry, anxiety, vexation, embarrassment, or anger." *Stevens v. Nat'l Educ. Ctrs., Inc.,* 11 S.W.3d 185, 185 (Tex.2000) (per curiam).

Appellant concedes Pybas suffered pain in the hospital, but appellant argues no evidence or insufficient evidence shows the pain resulted from appellant's negligence or lack of ordinary care. Appellant argues that Pybas's pain was a result of the final stages of his emphysema, congestive heart failure, and renal failure, which caused his death. Although these problems were the cause of his pain, there is evidence directly linking Pybas's pain to appellant's negligence and lack of ordinary care because Pybas was not in the final stages of these problems on January 22, and it was the lack of oxygen on January 22 and 23 that sent him into the downward spiral leading to his pain and death. Dr. Watson testified he had treated people in Pybas's condition that, with proper medical care, survived for months and years and, if the problems of January 22 had not occurred, "[i]t's very possible" Pybas could have survived for weeks or years. Dr. Watson testified that when he discharged Pybas, "our anticipation was that he was going to have a rough time, but we did not expect him to—to die." Dr. Cefalu testified that with adequate medical care and support at home, he has seen patients in Pybas's condition before his discharge on January 22 "live for years" with "[p]retty good quality of life." However, after the "insult" from the lack of oxygen following his discharge, it was not possible to maintain the medical balance.

■■■ Appellant's argument is, essentially, that because Pybas's poor health condition made him more susceptible to injury due to lack of oxygen, appellant should not be liable for the pain and mental anguish that were due to Pybas's final illness from congestive heart failure, emphysema, and renal failure, even if they

---

7. Appellant does not challenge the sufficiency of the evidence to support the jury's award of fifty thousand dollars to Dorothy for her past and future mental anguish and loss of companionship and society.

were triggered by appellant's negligence and lack of ordinary care in failing to provide supplemental oxygen. However, "[i]t is well settled that a tortfeasor takes a plaintiff as he finds him." *Coates v. Whittington,* 758 S.W.2d 749, 752 (Tex.1988) (orig.proceeding); *see Otis Spunkmeyer, Inc. v. Blakely,* 30 S.W.3d 678, 689 (Tex. App.-Dallas 2000, no pet.). Regardless of Pybas's health condition, he "is entitled to recover the damages resulting from the incident 'conditioned as he was at the time of the injury.'" *Coates,* 758 S.W.2d at 753 (quoting *Driess v. Friederick,* 73 Tex. 460, 462, 11 S.W. 493, 494 (1889) (*Coates* court's alteration removed)).[8] Likewise, the fact that Pybas was eighty-three years old and might not have lived much longer anyway does not relieve appellant of its liability for the pain and mental anguish Pybas faced in dying as a result of appellant's negligence and lack of ordinary care. If it were otherwise, no plaintiff could recover for the mental anguish of death because we must all die someday. No court has held a plaintiff could not recover for the agonies of death because of its inevitability regardless of the defendant's actions. Further-

more, the record contains no testimony that the pain and mental anguish Pybas experienced was the same he would later have experienced when dying if appellant had timely provided the supplemental oxygen equipment.

Appellant also argues the lack of oxygen could not have been the cause of appellant's pain because, when the paramedic, Lynn, arrived on January 23, appellant did not complain of difficulty breathing and did not exhibit shortness of breath. However, Dorothy testified Pybas had difficulty breathing all night, and the emergency room triage nurse noted shortly after Pybas's arrival at the hospital that his respiration was "deminished" [sic].

The evidence also shows Pybas suffered mental anguish attributable to appellant's negligence or lack of ordinary care. Dr. Cefalu testified about "the psychological insult of panicking for 12 to 16 hours: 'I have no oxygen, I'm going to die.' Tremendous insult here."[9] Pybas's mental anguish was also shown by his statement to his family on January 25 that "he is tired of fighting death and wants to die,"

---

**8.** The venerable *Driess* opinion, now more than a century old, discusses whether in a negligence case the jury should be charged that a defendant is not liable for damages exacerbated by a pre-existing injury. The supreme court held the jury should not be so charged because:

> The damages which appellee was entitled to recover were the damages resulting to himself, conditioned as he was at the time of the injury, and not such damages as he might have been entitled to had his condition been different. That the injury resulting from the negligence of appellants may have been aggravated or more easily caused by reason of the fact that the limb had received a former injury cannot affect the question of right to or measure of damages. Had the latter part of the charge refused been given, the jury would probably have felt authorized to inquire whether the injury would have occurred at all if the weakness from the former injury had not existed,

> which would not have been proper if the injury in fact resulted from the negligence of appellants.

*Driess,* 73 Tex. at 462, 11 S.W. at 494. This century-old rule still applies today. *See, e.g., Coates,* 758 S.W.2d at 752; *Otis Spunkmeyer, Inc.,* 30 S.W.3d at 689; *In re Doe,* 22 S.W.3d 601, 606 (Tex.App.-Austin 2000, orig. proceeding).

**9.** In its brief, appellant argues this testimony is not evidence because "[i]t is sheer speculation." Appellant cites no authority, and appellant did not object at trial to Dr. Cefalu's testimony on this ground. Appellant's argument is not properly before us. TEX.R.APP. P. 33.1(a); 38.1(h); *Dolenz v. State Bar,* 72 S.W.3d 385, 388 (Tex.App.-Dallas 2001, no pet.); *Richards v. Comm'n for Lawyer Discipline,* 35 S.W.3d 243, 250 (Tex.App.-Houston [14th Dist.] 2000, no pet.).

and his statement to a nurse on January 27 that he was afraid to go to sleep because he was afraid he was going to die. That Pybas suffered great pain is shown by his experiencing "breakthrough" pain, i.e., pain between doses of pain medication, as well as his moaning and stating to the nurses that he was in pain. Nurse Anna Hughes testified that Pybas's pain and fear, compared to those of other terminally ill patients she had cared for, rated a seven on a one-to-ten scale, with ten being the highest amount of pain and fear.

 After considering all the evidence in the record, we conclude the evidence is legally and factually sufficient to show Pybas suffered mental anguish, i.e., anguish that is more than mere worry, anxiety, vexation, anger, disappointment, resentment, or embarrassment.

 Appellant also argues the jury's award of three million dollars for Pybas's pain and mental anguish was excessive and "a significant remittitur" is appropriate. The excessiveness of damages is reviewed under the factual sufficiency standard. *Larson v. Cactus Util. Co.,* 730 S.W.2d 640, 641 (Tex.1987). If the damages awarded are excessive, this Court may suggest a remittitur. *Id.; see also* Tex.R.App. P. 46.3.

Appellant cites three cases it asserts show the pain and mental anguish award is excessive. In *Convalescent Services, Inc. v. Schultz,* 921 S.W.2d 731 (Tex.App.-Houston [14th Dist.] 1996, writ denied), the plaintiff was an elderly, bedridden resident of defendant's nursing home. *Id.* at 733. The plaintiff developed a large decubitus ulcer (a bed or pressure sore) that the nursing home staff allowed to worsen to where the bones were exposed. *Id.* at 733–34. The plaintiff went through surgery and a three-month hospitalization before being discharged to another nursing home. *Id.* at 734. The jury in that case

awarded actual damages of $380,000. *Id.* The court's opinion did not review the sufficiency of the evidence to support the damages awarded. In *Texas Health Enterprises, Inc. v. Geisler,* 9 S.W.3d 163 (Tex.App.-Fort Worth 1999, pet. dism'd by agr.), the defendant nursing home's failure to properly care for a resident (the plaintiff) resulted in the amputation of the plaintiff's foot. *Id.* at 166. The plaintiff lapsed into a coma two days later and died a week later. *Id.* The jury awarded the plaintiff's estate $200,000 for her pain and mental anguish. The opinion does not discuss what pain or mental anguish, if any, the plaintiff suffered. Finally, in *Cresthaven Nursing Residence v. Freeman,* —— S.W.3d ——, No. 07–02–00011–CV, 2003 WL 253283 (Tex.App.-Amarillo Feb.5, 2003, no pet.), the plaintiff, a nursing-home resident, was dropped by the defendant nursing home's staff and broke her leg, and she died sixteen days later. *Id.* at *11, at ——. The jury awarded actual damages to the plaintiff's estate of $4.5 million. The court of appeals listed the plaintiff's numerous severe health problems preceding her broken leg and observed "there is no evidence as to how the broken leg might have affected her long term physical and mental prognosis." *Id.* at *12, at ——. The court of appeals held the evidence was factually insufficient to support the $4.5 million actual damages award and suggested a remittitur of $3.5 million, reducing the actual damages to the plaintiff's estate to one million dollars. *Id.*

These cases do not show the three million dollar award in this case is excessive. Unlike the situation in *Cresthaven Nursing Residence,* the record contains Dr. Cefalu's evidence of how appellant's negligence and lack of ordinary care affected Pybas's long-term physical and mental prognosis. The record also contains the observations by the nursing staff of Py-

bas's physical pain and mental anguish. Accordingly, *Cresthaven Nursing Residence* does not show the damages in this case are excessive. *Convalescent Services, Inc.* and *Texas Health Enterprises, Inc.* contain no description of the pain and mental anguish the plaintiffs suffered. We conclude those cases do not show the damages awarded in this case are excessive.

■ By comparison, in *Wilhelm v. Flores*, —— S.W.3d ——, No. 13–98–148–CV, 2003 WL 22479211 (Tex.App.-Corpus Christi, Oct.30, 2003, no pet. h.), the plaintiff was stung by a honeybee, slipped into a coma from anaphylactic shock fifty minutes later, and died before an ambulance could reach him. *Id.* at *1, 9, at ——, ——. In that case, the jury awarded one million dollars in damages for pain and mental anguish, and the court of appeals held the damages were not excessive. *Id.* at *9, at ——. Likewise, in *Wellborn v. Sears, Roebuck & Co.*, 970 F.2d 1420 (5th Cir.1992), the plaintiff, a fourteen-year-old boy, was trapped underneath a garage door because of a malfunctioning garage-door opener sold by the defendant. *Id.* at 1422–23. The boy was conscious for a few minutes to several hours but eventually died trapped beneath the garage door. *Id.* at 1423. The jury awarded one million dollars for the plaintiff's "conscious pain and suffering." The Fifth Circuit held the one-million-dollar award for the plaintiff's pain and suffering before he lost consciousness was not excessive. *Id.* at 1428. In this case, Pybas's suffering and anticipation of death was much more than the few minutes to several hours endured by the plaintiffs in *Wilhelm* and *Wellborn.* If the one million dollar awards in those cases were not excessive, then the three million dollar award in this case is not excessive considering Pybas's six days of pain and mental anguish. We conclude appellant has not shown the pain and mental anguish damages the jury awarded are excessive.

We hold the evidence is legally and factually sufficient to support the jury's award for pain and mental anguish. We resolve appellant's sixth issue against it.

## EXEMPLARY DAMAGES

In its fourth issue, appellant asserts the evidence is legally and factually insufficient to prove by clear and convincing evidence that Pybas's injuries resulted from appellant's wilful act or omission or gross neglect.

### Requisites for Exemplary Damages

To recover exemplary damages, the plaintiff must prove by clear and convincing evidence that the plaintiff's harm resulted from, *inter alia*, the defendant's wilful act or omission or gross neglect. TEX. CIV. PRAC. & REM.CODE ANN. § 41.003(a)(3), (b) (amended 2003).[10] "Gross neglect" is defined as:

an act or omission:

(i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

---

10. Act of Apr. 11, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 110, *amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 13.04, 2003 Tex. Gen. Laws 847, 888 (substituting the term "gross negligence" for "wilful act or omission or gross neglect"); *see also* TEX. CONST. art. XVI, § 26 ("Every person, corporation, or company, that may commit a homicide, through wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body, or such of them as there may be, without regard to any criminal proceeding that may or may not be had in relation to the homicide.").

(ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

*Id.* §§ 41.001(7)(B), .003(a)(3) (amended 2003).

For a corporation to be liable for exemplary damages, the wilful act or omission or gross neglect must be committed by the corporation itself. *Mobil Corp. v. Ellender,* 968 S.W.2d 917, 921 (Tex. 1998). A corporation is liable for exemplary damages if it authorizes or ratifies an agent's wilful act or omission or gross neglect or if it is grossly negligent in hiring an unfit agent. *Id.* A corporation is also liable for exemplary damages through the wilful acts or omissions or gross neglect of its vice principals. *Id.* at 922. Vice principals are:

(a) corporate officers;

(b) those who have authority to employ, direct, and discharge servants of the master;

(c) those engaged in the performance of nondelegable or absolute duties of the master; and

(d) those to whom the master has confided the management of the whole or a department or a division of the business.

*Id.; see also Kroger Tex. Ltd. P'ship v. Suberu,* 113 S.W.3d 588, 602 (Tex.App.-Dallas 2003, pet. filed).

Evidence is "clear and convincing" if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Civ. Prac. & Rem.Code Ann. § 41.001(2) (Vernon Supp.2004).

Thus, to be entitled to exemplary damages, appellees had to prove by clear and convincing evidence that a vice principal of appellant committed a wilful act or omission or gross neglect resulting in Pybas's injuries or that an employee who was not a vice principal committed the wilful act or omission or gross neglect resulting in Pybas's injuries and appellant authorized or ratified the act, omission, or gross neglect.[11]

## Standard of Review

In a legal sufficiency review under the clear-and-convincing-evidence standard, we look at all the evidence in the light most favorable to the finding and will assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex.2002); *Kroger Tex. Ltd. P'ship,* 113 S.W.3d at 601. If, after conducting our legal sufficiency review of the evidence, we determine no reasonable fact finder could form a firm belief or conviction the matter that must be proven is true, then we must conclude the evidence is legally insufficient. *In re J.F.C.,* 96 S.W.3d at 266.

In a factual sufficiency review, we must give due deference to evidence a fact finder could reasonably have found clear and convincing. *Id.; Kroger Tex. Ltd. P'ship,* 113 S.W.3d at 601. We should consider whether disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.,* 96 S.W.3d at 266; *Kroger Tex. Ltd. P'ship,* 113 S.W.3d at 601. If, in light of the entire record, the disputed evidence a reasonable fact finder could not have credited in favor of the finding is so significant that a fact

---

**11.** A corporation could also be subject to exemplary damages for acting with gross negligence in hiring the employee; however, appellees do not assert appellant was grossly negligent in hiring Nurse Middleton or other employee.

finder could not have reasonably formed a firm conviction or belief, then the evidence is factually insufficient. *In re J.F.C.*, 96 S.W.3d at 266; *Kroger Tex. Ltd. P'ship*, 113 S.W.3d at 601.

### Evidentiary Analysis—Nurse Middleton's Conduct

Review of the evidence shows Pybas's injuries resulting from appellant's negligence or lack of ordinary care were due to the failure to provide supplemental oxygen for Pybas on his arrival at his house following his discharge from IHS on January 22. The evidence shows the lack of supplemental oxygen was the result of Nurse Middleton's negligence: (a) in failing to order the oxygen for Pybas as ordered by Dr. Watson; or (b) if Dr. Watson's telephone orders did not include supplemental oxygen for Pybas, in failing to ask Dr. Watson if Pybas would require supplemental oxygen at home. Additionally, the jurors were instructed that they could presume any evidence appellant destroyed after it learned of appellees' claims would be harmful to it. Under this instruction, the jurors could presume that any copy of the telephone orders Nurse Middleton destroyed after suit was filed in this case would show Dr. Watson ordered supplemental oxygen for Pybas on his discharge.

■■■■ Having reviewed the entire record and applying the legal and factual sufficiency standards of review for clear and convincing evidence, we conclude the evidence is legally and factually sufficient for a jury to find by clear and convincing evidence that Nurse Middleton's act or omission regarding Pybas's need for supplemental oxygen at home constituted a wilful act or omission or gross neglect.

However, Nurse Middleton is not a vice principal of appellant. Therefore, appellees cannot recover exemplary damages based on Nurse Middleton's conduct unless appellant ratified her conduct.[12] Ratification occurs when the employer or vice principal confirms, adopts, or fails to repudiate the acts of its employee. *Eikon King St. Manager, L.L.C. v. LSF King St. Manager, L.L.C.*, 109 S.W.3d 762, 768 (Tex.App.-Dallas 2003, pet. denied).

■■■ Appellees argue appellant ratified Nurse Middleton's conduct by rewarding her with a $500 bonus in April 1999. This bonus was given to all the utilization review personnel for reaching the bed-day targets[13] for that quarter. No evidence shows the bonus was given based only on Pybas's discharge. Nor does any evidence show other discharges during the period for the bonus resulted in injury or death to appellant's insureds. Nor does any evidence show Nurse Middleton's bonus was approval of her failure to order supplemental oxygen equipment for Pybas. Accordingly we conclude the fact appellant paid Nurse Middleton a bonus for reaching the bed-day target is not legally sufficient clear and convincing evidence of ratification of her failure to obtain supplemental oxygen for Pybas.

■■■ Appellees also argue appellant ratified Nurse Middleton's actions by not conducting any inquiry into the cause of Pybas's discharge without supplemental oxygen and his subsequent hospital readmission and death. Appellant had a quality assurance committee that would review important medical incidents concerning its insureds. Ordinarily, if a patient were readmitted to a facility within forty-eight

---

12. The record contains no evidence, and appellees do not assert, that appellant authorized Nurse Middleton to neglect to order oxygen for Pybas.

13. Bed-days were the number of days per thousand of appellant's insureds spent in inpatient facilities, including hospitals and skilled nursing facilities.

hours of discharge, the committee would review the incident. However, in this case, no such review occurred even though Pybas was admitted to the hospital less than forty-eight hours after his discharge from IHS. The record contains no explanation for the committee's failure to review Pybas's case. Because nothing in the record shows the reason for not reviewing Pybas's readmission, the failure to review is legally insufficient to show clearly and convincingly that appellant ratified Nurse Middleton's conduct.

After reviewing the entire record and looking at all the evidence in the light most favorable to the jury's verdict, we conclude that no reasonable fact finder could form a firm belief or conviction that appellant ratified Nurse Middleton's acts or omissions or gross neglect resulting in Pybas's injuries. Accordingly, appellees are not entitled to exemplary damages based upon Nurse Middleton's conduct.

### Evidentiary Analysis—Appellant's Vice Principals

Appellant also asserts there is legally and factually insufficient clear and convincing evidence to show its wilful acts or omissions or gross neglect through those of its vice principals, Dr. Seeley, appellant's medical director, and Nurse Jan Milligan, Nurse Middleton's supervisor, resulted in Pybas's injuries. Appellees assert the evidence shows appellant breached its standard of care by Dr. Seeley's pressuring Dr. Watson to discharge Pybas from IHS on a Friday. Appellees also assert the evidence shows appellant's business policy and manner of doing business violate its standard of care.

Appellees assert the Friday discharge was gross neglect by appellant and Dr. Seeley because it involved an extreme degree of risk to Pybas of which Dr. Seeley was aware but proceeded with conscious indifference to Pybas's rights, safety, and welfare. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 41.001(7)(B) (amended 2003). As several witnesses testified, Friday discharges are problematic because if something goes wrong, there might be no help available to the patient until the following Monday. However, no witness testified that the discharge on Friday posed "an extreme degree of risk" to Pybas. The danger to Pybas was the discharge without having oxygen set up in Pybas's home on his arrival. As discussed above, no evidence shows appellant or its vice principals authorized, approved, or ratified Nurse Middleton's failure to have oxygen equipment set up in Pybas's home on his arrival.

██ Appellees also argue the evidence shows Pybas was still qualified to stay at IHS on January 22 and, thus, Dr. Seeley should not have pressured Dr. Watson to discharge him then. The testimony shows a patient is qualified to be in a skilled nursing facility if skilled nursing care is required to prevent deterioration or to sustain the current condition. Even if each form of treatment can be adequately performed in a patient's home, treatment in a skilled nursing facility may be appropriate because of the complexity of the patient's problems. Dr. Watson testified he discharged Pybas from IHS after being pressured to do so by Dr. Seeley, but he stated, "I would like to have kept him a little longer because I think he would benefit from the care he was given." Thus, the record shows that to the extent Pybas was qualified to stay at IHS on January 22, he was qualified to do so because of his overall medical condition and not simply because he required supplemental oxygen. However, the only evidence in the record of what caused Pybas's medical downturn was the lack of supplemental oxygen from January 22 to 23, not his premature discharge from IHS.

Appellees also appear to argue that appellant's policies of placing profits over patient care warrant the imposition of exemplary damages. In support of their argument, they cite statements by the trial court observing that appellant "evinced a total lack of concern for Pybas's condition and well-being and a virtual obsession with the bottom line"; and that it was appellant's "corporate policy to get people out the door as fast as possible and reward those who do." The trial court's observations are supported by the record. However, the legislature has declared that gross neglect alone does not warrant the imposition of exemplary damages. Before exemplary damages may be assessed, there must be "clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from" the gross neglect. TEX. CIV. PRAC. & REM.CODE ANN. § 41.003(a)(3) (amended 2003). Pybas's premature discharge from IHS may have resulted from appellant's questionable balancing of business profits and patient care, and those matters may have increased the likelihood of Nurse Middleton's negligence and lack of ordinary care in failing to obtain supplemental oxygen equipment for Pybas, but the evidence does not clearly and convincingly show Pybas's injuries resulted from those policies and the premature discharge.

### Conclusion

After reviewing all the evidence in the light most favorable to the jury's verdict, we conclude no reasonable fact finder could form a firm belief or conviction that Pybas's injuries resulted from a wilful act or omission or gross neglect by appellant acting through its vice-principals. Accordingly, we hold the evidence is legally insufficient to support the exemplary damages award. We resolve appellant's fourth issue in its favor. Because of our disposition of this issue, we do not reach appellant's third, fifth, seventh, eighth, and ninth issues.

### JUDGMENT INTEREST RATE

In an issue raised in its reply brief, appellant requests that we apply the amended version of the pre- and post-judgment interest statutes and reduce the interest to a rate between five and fifteen percent. Effective September 1, 2003, the post-judgment interest rate changed from a minimum of ten percent to a minimum of five percent. See Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 1, 2003 Tex. Gen. Laws 2096, 2097 (codified at TEX. FIN.CODE ANN. § 304.003(c) (Vernon Supp.2004)). Before September 1, 2003, the post-judgment interest rate was the fifty-two-week treasury bill rate, but in no case less than ten percent or more than twenty percent. Act of April 23, 1999, 76th Leg., R.S., ch. 62, § 7.18(a), 1999 Tex. Gen. Laws 127, 232. On September 1, 2003, the post-judgment interest became the prime rate, but in no case less than five percent or more than fifteen percent. TEX. FIN.CODE ANN. § 304.003(c) (Vernon Supp.2004). The 2003 statute provides, "The changes in law made by this Act apply in a case in which a final judgment is signed or subject to appeal on or after the effective date of this Act." Act of June 2, 2003, 78th Leg., R.S., ch. 676, § 2(a), 2003 Tex. Gen. Laws 2096, 2097.

Appellant asserts the 2003 amendment applies in this case. Appellant concedes the judgment in this case was signed before September 1, 2003, but appellant argues that because this case was pending on appeal in this Court on September 1, 2003, it was "subject to appeal on or after the effective date of" the 2003 amendments. Because pre-judgment interest in a wrongful death case is awarded at the same rate as post-judgment interest, appellant asks

that we modify both the pre-judgment and the post-judgment interest rates by applying the 2003 amendment. *See* TEX. FIN. CODE ANN. § 304.103 (Vernon Supp.2004).

The Fort Worth Court of Appeals faced this argument in *Columbia Medical Center v. Bush,* 122 S.W.3d 835, 864–66 (Tex.App.-Fort Worth 2003, pet. filed). There, the court of appeals examined the legislative history and observed that the Senate Committee's bill analysis states section 2(a) of the act "Makes application of this Act prospective." SENATE COMM. ON JURISPRUDENCE, BILL ANALYSIS, Tex. H.B. 2415, 78th Leg., R.S. (2003); *Columbia Med. Ctr.,* 122 S.W.3d at 866. The court of appeals interpreted section 2(a) of the amendment as providing that the amendment applied to (1) judgments signed on or after September 1, 2003, and (2) judgments signed before September 1, 2003 but which did not become subject to appeal until on or after September 1, 2003, such as a default judgment in a multi-defendant case where the default judgment, although signed before September 1, 2003, was not appealable until the plaintiff's claims against the remaining defendants were disposed of after September 1, 2003. *Columbia Med. Ctr.,* 122 S.W.3d at 865–66.

█ We agree with the court of appeals' interpretation of the amendment. Because the judgment in this case was both signed and subject to appeal before September 1, 2003, the amended statute setting post-judgment interest rates does not apply. Accordingly, we conclude appellant's argument lacks merit. We resolve this issue against appellant.

## CONCLUSION

We modify the trial court's judgment to delete the award of exemplary damages.

In all other respects, we affirm the trial court's judgment.