

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-11-00029-CV

_____


IN THE MATTER OF THE MARRIAGE OF CHRISTINE RUTH SLANKER
AND TED EUGENE SLANKER, JR., AND IN THE INTEREST OF
T.L.S., A MINOR CHILD



On Appeal from the County Court at Law
Lamar County, Texas
Trial Court No. 77863



Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Ted Eugene Slanker, Jr., and Christine Ruth Slanker—after concluding that they no longer wished to remain married to each other and struggling through two years of contempt proceedings, restraining orders, depositions, motions to compel discovery, at least three settings for final hearing, two attorneys for Christine, and a trial conducted sporadically December 13–16, 2010—finally obtained a signed divorce decree and property division December 31, 2010.[1] Ted appeals, urging twelve, often multifarious, points of error accompanied by almost forty pages of stated facts and vehement argument and praying for remittitur or for remand. Christine, with a micro-brief containing just three lines of argument, agrees that the trial court erred and prays for remand. Because we conclude that (1) there was harmful error and that (2) remittitur or rendition is not appropriate, we reverse the trial court's judgment and remand this case to the trial court for a new trial.

*(1)    There Was Harmful Error*

Ted complains at length about the trial court's valuation and characterization of sizeable portions of the property divided and the propriety of its division, the exclusion of Ted's expert witness testimony, and the sorts of liens used by the trial court to secure Ted's payment of amounts ordered. He also argues that, because the oral pronouncement by the court differs noticeably from the written judgment, error exists. The details of the matters leading up to the divorce are

---

[1]December 31, 2010, was the last day on the job for the trial judge. The newly elected judge of the Lamar County Court at Law took office the next day. That transition affected this case.

largely irrelevant to our decision; thus, we will focus on the legal effect of the actions taken by the trial court.  On the other hand, a few procedural points are important, however, to explain the current posture of the case.

After the three-day trial, the trial court ruled orally December 28, 2010, in a telephone conference, during which one attorney was snowed-in in New York state.   The decree of divorce was signed December 31, 2010, the last day in office for the trial judge.   In addition, Ted alleges that the judgment was signed by the court without first being sent to Ted's attorney to review. Ted argues that many of the errors in this judgment resulted from that failure.[2]

The new trial judge granted judgment nunc pro tunc January 19, 2011, to make a few, more technical, changes.   The new judge declined to address other, more substantive, matters raised in a motion for new trial, however, stating that, as he did not hear the case, he was uncomfortable altering the judgment signed by the prior judge.

---

[2]The judgment signed by the trial judge who tried the case and granted the divorce ordered a $300,000.00 judgment to be paid in 100 monthly installments of $300,000.00 each.   It also contained other details that were either incomplete or inconsistent with the oral pronouncements of the trial court, as shown by the motion for judgment nunc pro tunc filed by opposing counsel and confirmed by the reporter's record.    In that regard, there was also a complaint about a schedule A that was part of the inventory used by Christine's counsel and attached to a proposed judgment—but although not used or referenced by the trial judge had been attached to the judgment, incorrect tenses being used in connection with stock account language, a failure to distinguish between a business and a website awarded to Ted, and several other matters.  We also note, that even though the findings of fact state that only Christine had separate property, the judgment itself is supported by an attachment that specifies certain property as being separate property of Ted.   Ted also contends that the errors in characterization of property and in valuing property led to an unsupportable order of a $300,000.00 judgment against Ted to "equalize" the estate.

Such alleged errors are not unique to the judgment.   In a motion for contempt, Christine's attorney alleged that Ted was in contempt because he had been "ordered to provide 90 pounds of human meat per month and 150 pounds of dog and cat meat per month to Christine . . . and owes petitioner 630 pounds of human meat and 1050 pounds of dog and cat meat which he has not provided to her and their child."   The dogs, cats, and humans in the area applaud this failure.

3

The property in dispute included some of Ted's stock—that had changed both in value because of market fluctuations and in number because of a reverse five-to-one split—a cattle ranch and an associated but separate business selling grass-fed beef and other specialty meat products. Also involved are a residence, a rental house, animals, an airplane, a boat, bank accounts, and various debts.

Although the parties agree that the judgment should be reversed, such a result is not automatic merely because both parties state they desire one. Both the rules and caselaw state that a reviewing court can reverse only when there is error in the judgment of the court below.[3] *Davis v. Bryan & Bryan*, *Inc.*, 730 S.W.2d 643, 644 (Tex. 1987); *Estate of Clinton v. S. Pac. Transp. Co.*, 709 S.W.2d 636, 639 (Tex. 1986); *Sears, Roebuck & Co. v. Marquez*, 628 S.W.2d 772, 773 (Tex. 1982); *Chrismon v. Brown*, 246 S.W.3d 102, 116 (Tex. App.—Houston [14th Dist.] 2007, no pet).

Christine's abbreviated brief to this Court does, however, simplify one aspect of our review considerably. In a civil case on appeal, we "accept as true the facts stated unless another party contradicts them." TEX. R. APP. P. 38.1(g). There are no contradictions to the facts stated by Ted, because Christine provides no alternative to Ted's version of the facts on appeal.[4]

Nevertheless, despite the agreement that this case should be reversed, we must still find reversible error to provide this remedy. We now turn to that analysis.

---

[3]This case does not involve an agreement by the parties to dismiss an appeal under Rule 42.1 of the Texas Rules of Appellate Procedure. TEX. R. APP. P. 42.1.

[4]That procedural artifact does not necessarily establish Ted's recited facts for general purposes, on a retrial, but allows us to accept Ted's statement of facts as a given for the purposes of our analysis.

We first address Ted's argument that the trial court committed reversible error by refusing to allow his named expert witness, James Davis, to testify about the value of the business related to the ranch, Slanker's Grass-Fed Meat (SGFM), and the value of community property goodwill connected with the business. For the exclusion of evidence to constitute reversible error, the complaining party must show that (1) the trial court committed error, and (2) the error probably caused the rendition of an improper judgment. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009); *McCraw v. Maris*, 828 S.W.2d 756, 757 (Tex. 1992); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989).

At trial, Christine's counsel claimed never to have been given Davis' curriculum vitae (CV) or informed of either Davis' expected use as a witness or of his testimony. The trial court refused to allow him to testify. The record shows, however, that, at a pretrial hearing, Christine's counsel explicitly acknowledged receiving his CV, report, and opinion concerning the nature of his testimony—all some eight months before trial. It is clear that Davis' testimony would have been helpful and relevant. It is also apparent that he was not allowed to testify because the trial court was inaccurately informed that counsel had not been given notice of Davis' existence, much less a CV or a report.

It thus appears that the witness was excluded for failure to timely identify and provide a report. *See* TEX. R. CIV. P. 193.6. It further appears that the decision was made in reliance on erroneous information provided by Christine's counsel at trial. A trial court's exclusion of an

expert who has not been properly designated can be overturned only on a finding of abuse of discretion. *Mentis v. Barnard*, 870 S.W.2d 14, 16 (Tex. 1994). In this case, the trial court was provided inaccurate information, and disregarded the actual state of affairs. We conclude that the exclusion of Davis' testimony was an abuse of discretion.

We must next determine whether the trial court's error in excluding Davis' testimony probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a); *Waffle House, Inc. v. Williams*, 313 S.W.3d 796 (Tex. 2010). To satisfy this standard, the improperly excluded evidence must be controlling on a material issue and not cumulative of other, properly admitted evidence. *Mentis*, 870 S.W.2d at 16; *Southland Lloyd's Ins. Co. v. Tomberlain*, 919 S.W.2d 822, 828 (Tex. App.—Texarkana 1996, writ denied). The rest of the evidence also must not have been so one-sided that the error likely made no difference in the judgment. *Cent. Expressway Sign Assocs.*, 302 S.W.3d 866. "[I]t is not necessary for the complaining party to prove that 'but for' the exclusion of evidence, a different judgment would necessarily have resulted." *McCraw*, 828 S.W.2d at 758. The complaining party must show only "that the exclusion of evidence probably resulted in the rendition of an improper judgment." *Id.* The role that excluded evidence plays in the context of the trial is also important. Thus, the exclusion or admission is likely harmless if the evidence was cumulative, or the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 873 (Tex. 2008). But if erroneously admitted or excluded evidence was crucial to a key issue, the error is

6

likely harmful. *Id.* Determining whether a particular error is harmful depends on the particular case. *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870. In making this determination, we review the entire record. *Id.*

In this case, the excluded testimony was the only expert testimony from either party that would have been provided on these subjects—essentially that SGFM had net losses of over $200,000.00 from 2006 to 2009 and that Ted had made repeated loans from sales of separate property stocks to keep the company liquid. The expert would also have testified that any business goodwill was minimal because of the losses and that any that did exist was Ted's because of his immersion in and total involvement with the business and its marketing, while Christine's actual efforts connected with that business were at best minimal. As the overriding matter at issue was the valuation and nature of the property, it is difficult to think that a possible error of approximately $200,000.00 in determining the value of the estate would be considered de minimus. It was thus crucial to the key matter before the court, and its exclusion was thus likely harmful.

Ted also argues that the trial court used values for stock owned by Ted that were simply wrong. Essentially, he argues that the trial judge followed red herrings laid out by Christine's counsel, rather than the evidence. He also argues that the value placed on the ranch was without any real support in the evidence. The most extreme allegations involve what either is, or at one point was, the major asset other than the ranch, a large amount of stock owned by Ted. Although

7

the evidence showed that the particular stock (TZA) had suffered a one-to-five inverse split, reducing the number of shares owned from 16,500 to 3,300 and that both that stock and the predecessor stock which had been traded for it had lost value in a substantial manner, Christine continued to argue that Ted had sold stock and secreted in some unknown place hundreds of thousands of dollars. Christine appears to have compounded the error by using the pre-split number of shares and multiplied that by the post-split value per share to calculate the amount that should exist in the brokerage account and which obviously was not there.

The result was that Christine's counsel informed the court that the value of the two stocks was over $800,000.00, when the remaining shares of stock at the time of trial was much less.

The trial court did not make any findings of fact about the stock valuation, and its judgment contains no specific references to stock valuations other than a generic statement that the Wolverton account, worth $100,000.00, was given to Ted. The court did find that Ted could not trace either stock or cattle back to separate property, thus evidently concluding all such property was community. However, Christine also acknowledged that the brokerage account had belonged to Ted well before the marriage and that the predecessor stock was in the account at the time of their marriage. Thus, though her testimony that particular stocks were acquired during marriage was correct, the evidence indicates for the most part not a purchase from outside, but shifting of assets from one stock to another within the account, a factor suggesting that tracking Ted's separate property might be appropriate.

In a tertiary argument, Ted also complains that funds derived from his separate property accounts made up shortfalls in the community-property business, but were not properly credited in his favor by the trial court.

Although counsel's argument may have merit, we have not followed the argument entirely. But, based on Ted's recitation of numerous facts, pointing to error in the trial court, *see* TEX. R. APP. P. 38.1(g), we conclude that the trial court erred based on the evidence and argument at trial, in characterizing the amounts involved in the brokerage account as wholly community.

Because there is reversible error, we are authorized to accept the parties' agreement that reversal is appropriate here.

*(2)     Remittitur or Rendition Is Not Appropriate*

Ted's reply brief argues that, notwithstanding the agreement that error occurred, Ted has also requested a remittitur or rendition.   He asserts, therefore, that a simple reversal and remand is not enough.   A rendition or a suggestion of remittitur could be available in limited circumstances where this Court was presented with evidence of such absolute clarity that it could render a judgment of property division differing from the trial court's, or could suggest a remittitur to correct an imbalance in the intentionally disproportionate division made by the trial court.   *See Phillips v. Phillips*, 296 S.W.3d 656, 682 n.12 (Tex. App.—El Paso 2009, pet. denied); *Burney v. Burney*, 225 S.W.3d 208, 220 n.3 (Tex. App.—El Paso 2006, no pet.).

But, the evidence is not such as to allow this Court to render judgment or suggest a

9

remittitur as requested by Ted. The division of multiple properties, some separate, some community, is by its very nature a judgment call based on the evidence and what is believed by the trial court. This Court, although it may conclude certain property is separate and certain property is community, is not in a position to observe the parties and bury itself in the minutiae of all the lists of properties these parties evidently believed important enough to demand possession of as a result of the division. In such a situation, rendition is not appropriate. *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990); *see Rosenblatt v. Freedom Life Ins. Co. of Am.*, 240 S.W.3d 315, 324 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 211 (Tex. App.—Austin 2005, pet. denied) ("We cannot render judgment . . . because the evidence is not conclusive.").

An appellate court can also suggest an appropriate remittitur. However, the availability of that remedy is limited in scope. Typically, it exists in conjunction with excessive damage awards. *See Tony Gullo Motors I*, *L.P. v. Chapa*, 212 S.W.3d 299, 315–16 (Tex. 2006) (Johnson, J. concurring); *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987); *CIGNA Healthcare of Tex., Inc. v. Pybas*, 127 S.W.3d 400, 415 (Tex. App.—Dallas 2004, judgm't withdrawn). It can be appropriate regarding a default judgment with a variance between the pleadings and the judgment actually entered. *Gulf States Petroleum Corp. v. Gen. Elec. Capital Auto Lease*, 134 S.W.3d 504, 510 (Tex. App.—Eastland 2004, no pet.); *cf Nat'l Freight*, *Inc. v. Snyder*, 191 S.W.3d 416, 426 (Tex. App.—Eastland 2006, no pet.) (declining to allow remittitur as remedy for failure

10

to properly segregate past medical expenses at trial).

When a record does not allow us to determine an amount of remittitur that might be properly suggested, that remedy is likewise unavailable, and we must remand for a new trial. *See Downing v. Burns*, 348 S.W.3d 415 (Tex. App.—Houston [14th Dist.] 2011, no pet.). In such a situation, the exact amounts to be provided to each party are not known with the clarity that might allow remittitur to be available. *See Playboy Enterp., Inc. v. Editorial Caballero*, *S.A. de C.V.*, 202 S.W.3d 250, 272 (Tex. App.—Corpus Christi 2006, pet. denied).

We decline the invitation to either render judgment or suggest a remittitur.

We reverse the judgment of the trial court as to the property division and remand the cause for a new trial on that subject.


Josh R. Morriss, III
Chief Justice

Date Submitted:     November 2, 2011
Date Decided:      November 18, 2011

11